WAPELHORST et ux. v. LINDNER.

No. 44055.

Supreme Court of Missouri.

Division No. 1.

July 12, 1954.

Francis R. Stout, Richard M. Stout, St. Louis, for appellants.

W. H. S. O'Brien, Dearing & Matthes, Will B. Dearing, Hillsboro, for respondent.

LOZIER, Commissioner.

Plaintiffs-appellants (herein called plaintiffs) sued defendant-respondent (herein called defendant) for $15,000 damages for the alleged wrongful death of plaintiffs' son, Robert Wapelhorst. The verdict and judgment were for defendant and plaintiffs appealed.

Nine-year-old Robert died immediately after the bicycle he was riding was struck by defendant's automobile, driven by defendant. Plaintiffs went to the jury upon defendant's primary negligence in failing to see Robert "approaching and upon said highway" and "to sound a horn or other warning of the approach of his said automobile." Plaintiffs now allege error: In the refusal of their requested Instructions A and B, the only instructions they offered submitting defendant's humanitarian negligence; in the rejection of evidence and in improper argument of defendant's counsel. Plaintiffs also contend that the verdict was "against the facts admitted by defendant's own testimony." Defendant contends that, as plaintiffs failed to make a submissible humanitarian case, Instructions A and B were properly refused.

The collision occurred in the south lane of U. S. Highway 50 or Manchester Road in St. Louis County, a short distance west of the driveway or entrance to the Dreamland Tourist Court (on the south side of the highway). The pavement is 40 feet wide. The two 10 foot north lanes are for westbound traffic and the two 10 foot south lanes for eastbound traffic. About a half block east of the tourist court, the highway intersects Barrett Station Road. On the southeast corner of that intersection is the Witte "drive-in" store property, the store building itself being some distance east of the intersection. Robert lived with his parents (instant plaintiffs) in their home and automobile repair garage on the south side of the highway about a block and a half west of the Witte store property.

In the late afternoon of October 7, 1952, Robert's father sent him to the store to get some notebook paper. Sometime later, a few minutes after 6 p. m., the father (then working outside the garage) heard "a noise, saw a commotion down there and so I went down. * * * The sun had gone down, it was twilight, you could see quite a ways, it wasn't quite dark." It took him about two minutes to get there. Robert was lying on the highway shoulder east of the tourist court driveway, about 6 feet from the pavement edge. The father saw the front wheel of Robert's bicycle in the south highway lane, west of the driveway. He looked for but saw no skid marks on the pavement. He heard defendant say that he "never did see the boy." The bicycle was a "28 inch" one. Robert could ride it without blocks on the pedals; the father had "had the seat lowered * * * as far as it could go"; it was Robert's second bicycle and he had had it for more than two months; his other one was "much smaller, a 24 inch." Robert helped around the 6-acre home place—washed dishes, worked in the garden, drove the tractor in "getting the hay in," and helped in the garage. Robert had been in good health and was a good student at school.

Charles Witte, Jr., testified that around 6 p. m. Robert was in the store and bought some notebook paper. He left the store on his bicycle going west "in the direction of (his) home. I assume he did, he went in that general direction. * * * Q. How far did you see him after he left the store? A. I would say about 50 feet. Q. When you last saw him was he on Manchester Road? A. No, in my driveway * * * going toward Manchester Road. * * * He was still on my property." Witte's driveway was "right past (east of) that sign about 75 to 90 feet." (Witte was re-

ferring to the tourist court's advertising sign in a photograph exhibit. The exact location of the sign was not shown. Apparently, it was just off the highway shoulder, in the center of the tourist court driveway, the width of which, according to another witness, was 37½ feet.)

Sidney Ayres and Charles Koch were loading rock on the north side of the highway opposite the tourist court. The evening was clear and "it was getting dark, they had the lights on the cars. It wasn't dark, it was dusk." Prior to the collision, Ayres and Koch did not see or hear defendant's car. Neither saw Robert but Ayres "heard the boy whistling" and Koch "heard a child, or boy whistling and heard the rattle of a bicycle, noise a bicycle makes." The noise came from "back" (south) of him.

Both Ayres and Koch "heard the crash." Ayres looked up and saw the car "about even with the (tourist court) driveway." According to Koch, the car was a few feet east of the driveway. Ayres "saw sparks flying from under the automobile" and "that lasted until the car stopped." Ayres and Koch ran across the highway. The boy was lying in the tourist court driveway about 2 feet from the pavement. The car was stopped about 60 or 70 feet east of the driveway. Its lights were on. The bicycle's handlebars and front wheel were lying on the highway shoulder, close to the pavement "a little less than half way between the driveway and this spillway" on the photographs (that distance is not in the record) according to Ayres, and 35 or 40 feet west of the driveway according to Koch. The car's front wheels were off the pavement; the right front fender was bent and the right headlight was broken; "half of the bicycle, the back part, the hind wheels," was hung under the car.

Robert's mother testified that, when she arrived at the scene, she talked to defendant who said, "I will swear that I never saw that boy."

Deputy Constable Joseph H. Baker, Jr., who arrived at the scene after the collision, said that the car was east of the tourist court driveway with parts of the bicycle caught in the car's undercarriage; the car was "a good 30 feet east of the tourist court driveway. * * * The handlebars and other wreckage * * * were lying east of where the boy was. * * * The handlebars were back of the car," on the highway shoulder "between the driveway and the car." Baker heard defendant say he "didn't see the boy and didn't know where he came from or nothing; he was so worked up about it."

Roy Dietsch, a bicycle expert, testified that the bicycle weighed about 55–60 pounds. "Q. Would a grown, vigorous man be able to operate that bicycle at a faster rate of speed than any nine-year-old boy? A. Well, to begin with, a 28-inch bicycle would be very large for any nine-year-old boy, even if he was large, it would be very difficult for him to handle it like a grown man would. A 28-inch bicycle is made for a grown man, not a nine year old. Q. The question was, would a man be able to operate that bicycle faster than a boy? A. Most certainly, considerably faster." Over objection, Dietsch testified that, in his opinion, Robert's speed, on the pavement between the tourist court driveway and a point on the pavement north of where the bicycle's handlebars and front wheel were found (35–40 feet), would not have exceeded 15 m. p. h. "and it is possible he couldn't have gone that fast in that short a distance."

Plaintiffs closed their case by introducing these portions of defendant's deposition: Defendant first saw Robert when the boy was "about ten feet in front of my car"; the boy was then "crossways on the slab, crossing * * * about ten feet in front of me on my right-hand side * * * out in the highway about four feet * * * somewhere in the vicinity of the right-hand lane of traffic"; defendant was going 50 m. p. h.; he did not apply his brakes "at any time before the accident"; he "was unable to sound a horn at any time before the accident"; it was after dark and his car lights were on; defendant told the police, "I didn't see the boy until he was right in front of

me"; under the then conditions, defendant could have made an emergency stop in 110 feet, including reaction time and "the resistance of the brake"; there was no car on the highway to the left of his car at the time; he applied the brakes, but not sufficiently to cause the car to skid.

Defendant's testimony at the trial was substantially the same as that just summarized, with one exception. He was not so sure that the bicycle was "crosswise" on the pavement. According to his "closest recollection, it was coming across, to my left." When he first saw the boy 10 feet in front of him and "right in front of the driveway," he was "unable to get his brakes on." He swerved to his left and stopped "as fast as he could"—in about 70 feet after the collision, he estimated. There was nothing to obstruct his "vision there or on the road, on the shoulder of the road"; the highway was "fairly level, with a gradual upgrade and there were shoulders on both sides of the pavement." Objection to this question was sustained: "Now, was there any reason why you didn't see the boy before he was right in front of your car?" There was a little "bump" in the car's right front fender, its right headlight was broken, and its hood was "buckled."

Upon cross-examination, defendant admitted that, in his deposition, he had stated that he did not know "which way he (Robert) was heading, toward his (defendant's) right or left," when he first saw the boy. At trial time, he "didn't know where the boy came from." He was "not positive that the boy was crossways of the road," but was sure that Robert was "in motion, about four feet out on the slab and in front of the right front of the car." He knew the boy was moving but didn't know which way. Defendant did not know how far ahead his headlights would "show, light up," but thought it was "pretty far, they were good, normal operating headlights; they were on bright, not dim." There was nothing "to obstruct his vision there or on the road, on the shoulder of the road." He estimated that, moving at 50 m. p. h., the shortest distance within which he could stop his car was 110 feet. He did not sound his horn.

Mrs. Velma Vickers, who lived at the tourist court, heard the crash and went to the scene. She heard defendant say that he didn't see the boy "until he was right at me. He said, 'I don't know where he came from.'" She saw the boy's body and defendant's car. The distance between them (as she thereafter "stepped it") was 26 steps (65 feet—her "step" was 2½ feet). The width of the driveway was 15 steps (37½ feet). The boy's body was 4 steps (10 feet) from the eastern edge of the driveway. The driveway was "blacktop." The shoulder east of the driveway was graveled; west of the driveway, it was graveled "only a little way," and, on the west to the spillway, it was grass. The slope of the driveway toward the pavement was down.

James H. Gunther said that he was driving his car a few car lengths behind defendant's; his (Gunther's) headlights were on; he "could read his (defendant's) license number without any trouble." He saw "a big combustion, smoke or dust or something in the vicinity of" defendant's car "and then he (defendant) swerved to the left." Gunther "put on his brakes" and swerved to the left. He "saw the boy lying on the shoulder," just off of the tourist court driveway. Gunther had not seen the boy before. Defendant's car came to a stop 50–75 feet beyond the boy's body.

Trooper Bradley Young, of the state highway patrol, stated that he arrived at the scene after the collision; there were no skid marks on the pavement. There was debris (dirt from the bottom of the car) in the south travel lane opposite the center of the tourist court driveway. The bicycle had no lights or reflectors; defendant said, "I didn't see the boy until I was almost on top of him so I couldn't stop"; defendant's car, going at 50 m. p. h., could be stopped in 200 feet. In Young's opinion, defendant "probably could have stopped in 75 feet, counting reaction time, but there would be some skid marks."

Before considering plaintiffs' contentions as to the submissibility of their case under the humanitarian doctrine, we consider their other allegations of error—i. e., those based upon certain rulings by the trial court in the case as submitted below. As stated, plaintiffs went to the jury upon defendant's primary negligence in failing to warn. In their verdict-directing Instruction 1, plaintiffs hypothesized that Robert "entered said road and came upon said road in front of and to the east of defendant's automobile, and * * * that defendant saw, or in the exercise of the highest degree of care could have seen, said Robert Wapelhorst approaching and upon the said highway, and that defendant failed to sound a horn or other warning of the approach of his said automobile toward the said Robert Wapelhorst * * * and * * * that at said time the said Robert Wapelhorst was exercising ordinary care for his own safety, * * *."

Plaintiffs contend that "defendant's own testimony amounts to an admission that defendant was negligent in not discovering the deceased on the highway; the only defense to this primary negligence of the defendant would be the contributory negligence of the deceased; there was no evidence that the deceased was guilty of contributory negligence and the presumption of law would be contrariwise; therefore the verdict was against the admitted facts and should be set aside."

■■ "Whether one is guilty of contributory negligence depends upon the particular facts and circumstances surrounding the occurrence that caused the injury." Williamson v. St. Louis Public Service Co., 363 Mo. 508, 252 S.W.2d 295, 299[5–8]. Here, the jury could have found that Robert was contributorily negligent in leaving the shoulder and going into the eastbound travel lane when he saw or should have seen defendant's car, or the lights of his car, coming from the west in that lane. The assignment is overruled.

■ Plaintiffs next contend that the trial court erred in sustaining defendant's counsel's objection to this question (asked of defendant upon cross-examination).: "Now, was there any reason why you didn't see the boy before he was right in front of you?" As defendant had previously testified that "there was nothing to obstruct his vision," the trial court's ruling could not have materially prejudiced plaintiffs. The assignment is overruled.

■ Plaintiffs make two assignments relating to the trial court's rulings as to argument of counsel. Arguing that defendant was not negligent, defendant's counsel said: "I am convinced that all of you will come back and say that this is one of those unfortunate experiences we all wish to avoid. We all wish that no nine-year-old boy would be put on a 28-inch bicycle, isn't that something to be considered? How well could a nine-year-old boy operate—." Plaintiffs' counsel's objection was overruled. Plaintiffs now argue that the argument "seems well calculated" to inject the unpleaded issue of plaintiffs' own contributory negligence in letting their son ride a 28-inch bicycle. However, we believe that the statements were within the bounds of legitimate argument and that the trial court's ruling was clearly not an abuse of discretion.

Plaintiffs' counsel stated in his argument: "The court tells you the law of the State of Missouri is Lindner has to exercise the highest degree of care in the operation of that automobile, just to avoid the occurrences of unfortunate things like this. You don't have to be a little careful in the operation of your automobile, you have to be very careful. Is it being very careful when he doesn't see something clearly visible in an open area until that something clearly visible is right in front of him?" The trial court sustained defendant's counsel's objection, motion to strike and request that the jury be cautioned to disregard the argument. Plaintiffs now argue that "defendant's failure to discover the deceased was a vital part of the theory upon which the case was submitted to the jury"; that the refusal to allow plaintiffs to argue the matter "was prejudicial as tending to tell the jury that failure to discover the deceased when he could have been discovered

was not material in the case when it was material."

We find no merit in this assignment. The entire arguments of counsel for both parties are not in the transcript filed here. We cannot determine from the record, and plaintiffs have not demonstrated, that the error, if such it was, in striking these isolated statements was error materially affecting the merits of the action.

Turning now to plaintiffs' contention that the trial court erred in refusing their requested verdict-directing Instructions A and B. Instruction A hypothesized that "at the time and place in question" deceased "became and was in a position of imminent peril and danger from collision with defendant's automobile and that when" deceased "was in such position of imminent peril the defendant saw, or by using the highest degree of care could have seen" deceased "in the aforesaid position of imminent peril and danger * * * in time thereafter, by using the highest degree of care and with the means and appliances then at hand and with safety to defendant and his automobile and other persons on said highway, to have swerved said automobile to the left or to have sounded a horn or other warning of the approach thereof * * * and by so doing could have prevented the collision," etc. Instruction B hypothesized that deceased was, "just before said collision, on the paved portion of Manchester Road and in a position of imminent danger of being struck by said automobile, and that the defendant saw, or by the exercise of the highest degree of care could have seen," deceased "on said pavement and in a position of imminent peril of being struck * * * in time thereafter by the exercise of the highest degree of care on the part of defendant and by means of the appliances then at hand, and with reasonable safety to himself and his said automobile, to have changed the course of the said automobile or to have sounded a horn or other warning of the approach of said automobile toward said" deceased "and that the defendant could have so done and thereby have avoided the collision," etc. (Our italics.)

Thus, plaintiffs proposed to submit whether, after Robert came into a position of imminent peril, defendant could have avoided the collision by swerving or by warning. We have concluded that the trial court properly refused to submit either of those issues to the jury.

In determining the submissibility of plaintiffs' case as to defendant's humanitarian negligence, we view the evidence in the light most favorable to plaintiffs and make all reasonable inferences therefrom; we disregard defendant's evidence not favorable to plaintiffs; and we give plaintiffs the benefit of any of defendant's evidence not in conflict with the fundamental theory of plaintiffs' case. See v. Wabash R. Co., 362 Mo. 489, 242 S.W.2d 15, 17[3].

So viewing the evidence: The jury could have found from the direct and circumstantial evidence that the car's right front fender or the right part of the car's bumper struck the bicycle, squarely or obliquely, about 4 feet north of the south pavement edge and 40–50 feet west of the tourist court driveway (the bicycle's handlebars and front wheel were knocked to the south shoulder 35–40 feet west of the driveway). Robert came into a position of imminent peril of being struck by defendant's car at some point east of the collision point. Defendant should have seen the boy in such position of imminent peril.

But the difficulty with plaintiffs' contention (that they made a submissible humanitarian negligence case) is that there was no substantial evidence as to when or where Robert came into a position of imminent peril. Witte's testimony was that, when he last saw Robert, the boy was then on Witte's property, in Witte's driveway, "about 50 feet" from the store "going toward" but not then "on" Manchester Road (obviously meaning the pavement). There was no evidence of Robert's approximate position at that time (how far south of the pavement he was, or how far east of Witte's west property line or of the collision point he was) or of his course on the shoulder

"toward" the pavement. In the absence of such evidence, the jury could not reasonably have inferred either that the boy was *then* in a position of imminent peril, or *when or where thereafter* his course toward the path of defendant's automobile brought him into such position. The only reasonable inference drawable from the instant record is that the boy came into imminent peril at some time and at some place east of the collision point. Any finding as to when and where he came into imminent peril would be pure speculation, guess and conjecture.

Defendant's testimony was that he saw the boy when the bicycle was 10 feet east of the front of defendant's automobile. Obviously, defendant could not thereafter have avoided the collision by swerving or sounding a warning. True, plaintiffs were not bound by that testimony of defendant. True, the jury could reasonably have found that Robert was in a position of imminent peril before he was 10 feet east of the front of defendant's automobile. However, there was no substantial evidence of how long before, or of how far east of the latter point, Robert came into imminent peril. Only by speculating as to the boy's course or direction of travel, and only by conjecturing as to when he came into and was in imminent peril, could the jury have found that he was in imminent peril at a time and place when and where defendant could *thereafter* have avoided the collision.

"One of the constitutive factual elements of a claim or cause of action under the humanitarian rule is that a defendant (after he knew or, if he had a duty to be on the lookout, after he, in the exercise of the prescribed degree of care, should have known plaintiff was in imminent peril) had the present ability with the means at hand to have averted the impending injury." Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972, 976[5–8].

There being no substantial evidence from which the jury reasonably could have found when and where Robert came into imminent peril, plaintiffs failed to make a submissible humanitarian negligence case. It follows that the trial court did not err in refusing to give plaintiffs' requested Instructions A and B.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.