Floyd WEST, Respondent,

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Appellant.**

No. 45091.

Supreme Court of Missouri.

Division No. 1.

Nov. 12, 1956.

James L. Homire, St. Louis, Earl E. Roberts, Steelville, Donnelly & Donnelly, Lebanon, Robert T. Donnelly, Lebanon, David Donnelly, Lebanon, for appellant.

John W. Waller, Sullivan, G. C. Beckham, Steelville, for respondent.

DALTON, Judge.

Action for damages for personal injuries and property damage sustained December 16, 1950, when defendant's eastbound passenger train struck plaintiff's southbound "pickup" truck on a public crossing in Leasburg, Missouri. The action was instituted August 11, 1954, in the Circuit Court of Crawford County. The cause was submitted solely on negligence under the humanitarian doctrine in failing to warn of the approach of the train or slacken its speed after defendant's trainmen saw or by the exercise of ordinary care could have seen plaintiff in a position of imminent peril of the approaching train.

Verdict and judgment were for plaintiff for $16,000 and defendant has appealed.

The cause comes to this writer on reassignment after a motion for rehearing had been sustained and the cause was re-argued and re-submitted. Defendant-appellant assigns error on the trial court's refusal to direct a verdict for the defendant at the close of all the evidence and contends that no substantial evidence was presented tending to show that, after it became apparent or should have been apparent to defendant's trainmen that the plaintiff was in imminent peril, the trainmen could have sounded a warning or slackened the speed of the train and have thereby avoided the collision A statement of the evidence favorable to plaintiff is required. We shall disregard the defendant's evidence unless it aids the plaintiff's case. Wapelhorst v. Lindner, Mo.Sup., 269 S.W.2d 865, 870.

Defendant's main line railroad track extends in an east-west direction through the village of Leasburg and over the public crossing in question. Another track variously referred to as a house track, passing track, switch track or siding is located 8 or 10 feet to the north of the main line track. The road which crosses defendant's tracks at right angles at the place in question, is referred to as Highway "H". The crossing was marked by two crossing signs, "posts with arms." Defendant's main line track extends straight west from the crossing for some 1300 feet. On the north side of defendant's right of way, north of the passing track and some 150 feet to the west of the crossing, there was a loading chute or dock, some stacked props and a tie pile that, according to plaintiff, "kind-a obstructed the view." One of plaintiff's witnesses testified, however, that defendant's trainmen on an approaching engine could have seen over the obstructions and could have seen a truck approaching the crossing, although the obstructions might have interfered with the truck driver's seeing an approaching train, that is, until the truck

reached the switch or passing track. Another of plaintiff's witnesses said that the approaching train could have been seen by plaintiff, when the truck was within 35 feet of the main line crossing.

Knight's store was located about 100 feet north of the north rail of the passing track and west of Highway "H". Another road extended west from Highway "H", and along the north side of defendant's right of way. There was a downgrade of 6 or 8 feet from Knight's store to the level of the railroad tracks and the crossing. Defendant's station is located 200 to 300 feet east of the crossing.

Plaintiff's testimony tended to show that he was 55 years of age and resided five miles south of Leasburg; that he was engaged in farming and carpenter's work; that he was in good health, physically strong and able bodied; that his hearing and eye sight were excellent; that he owned a 1940 Chevrolet "pickup" truck, which was in perfect condition, since he had recently had it worked over; and that at ten miles per hour he could have stopped it in 2 feet, since the minute he stepped on the brake it would stop.

On the afternoon in question, he was in Knight's store and, about 3:30 p. m., he came out of the store and got in his "pickup" truck with his wife. His truck was parked off Highway "H" on the east side of the store. He backed out into the highway, turned to his left, started off in low gear and headed south down a 6 or 8 foot grade from the store building to the level of the railroad tracks on the crossing. As he approached the crossing, he didn't stop at any time, but he kept looking to the west for a train. He was quite familiar with the crossing having crossed it thousands of times. He didn't see or hear anything and when he got down "pretty close" to the track, he looked to the east and saw nothing. When he reached the house or passing track, he took "a second look" to the west. He also said he looked west about the time he "was on the first

track." When he reached the passing track, he saw nothing approaching on the west, so he shifted into second gear, quit looking, and started across. He did not look west again. He knew it was time for the afternoon passenger train to appear. He knew the train had not gone by and that it was running late. He was expecting the train to come through, "that is why I was cautious," and he had been looking "practically all of the time." He crossed the tracks at 8 or 10 miles per hour, not more than 10 miles. He was in his own west lane and he maintained the same speed in going across the crossing.

When he started to drive right on across, he heard no bell or whistle or any horn and, if there had been one, he would have heard it. He didn't hear any warning of any kind and didn't see the train until it hit. He further testified that something attracted his attention; and that "I seen it just a split second. I seen it and it hit just as I saw it * * * I didn't have no time or nothing, just a glance and then it hit." Plaintiff said "the cab of the truck" was "pretty near in the middle of the track" when he first saw the train; and that "it looked like the cowcatcher hit the right rear wheel." He further said that, when on the main line track at the point of collision, he could have seen up the track 200 yards to the west. At this time it will be unnecessary to discuss the extent of the injuries he sustained or the amount of the damages to his truck

There was further substantial evidence tending to show that it was a clear, cool day with a temperature of 35–40 degrees; that the sun was shining and low in the west; and that no signals or warning of the approach of the train were given. There was no evidence of any change in the speed of the train before it reached the crossing, except as might be inferred from defendant's evidence that the train stopped with the front of the locomotive at the west end of the station. One of plaintiff's witnesses said he observed no abrupt

change in the speed of the train. There was evidence that the train was "sorta gliding in", "coasting in"; and that the impact of the engine was on the right hand side of the truck "on the front end, back as far as the door." There was also other evidence that the "impact was on the right rear wheel"; and that the damage was about the rear wheel. Plaintiff's witness fixed the speed of the train at 35 or 40 miles per hour, when it was 300 or 400 feet west of the crossing and further testified at that time the truck was 35 feet from the main line track.

The collision happened on the south side of the main line track, it looked like the train just caught the back end of the truck, "because it swung around." The truck came to rest south and east of the crossing. There was other evidence that plaintiff moved across the crossing at the same speed and did not slow up or speed up and that the overhang of the engine and cars was about 1½ feet.

█ In support of its contention that the court erred in failing to direct a verdict for defendant, appellant insists that there was no evidence adduced to show when it became apparent or should have been apparent to the enginemen that respondent was in a position of imminent peril; and that there was no basis for any finding as to when the enginemen should have discovered that respondent was oblivious to the approach of the train. Respondent testified that when he reached, or was upon the passing track, he satisfied himself that no train was approaching. He then shifted into second gear and proceeded, intending to go over the crossing. On his own testimony, respondent was not in imminent peril until he decided to go on across the crossing. This decision was reached at or on the passing track when he shifted to second gear and started across at an even speed of 8 or 10 miles per hour. Thereafter, he did not look to the west and was oblivious of the danger. Respondent could stop in 2 feet and, as long as he was

looking west, with an unobstructed view, expecting the train and had 13 feet or more in which to stop and had not yet decided to proceed on across the crossing, he was not in imminent peril. On the facts stated the trainmen could assume that respondent would discover the approach of the train and stop before reaching the crossing. It was only when respondent ceased to look to the west and proceeded with the apparent intent of entering the path of the train that respondent's testimony would sustain a finding of imminent peril. Peril to be "imminent peril" under the humanitarian doctrine must be certain, immediate and impending, a mere possibility of injury is not sufficient to create imminent peril. Dister v. Ludwig, 362 Mo. 162, 240 S.W.2d 694, 699.

While respondent's testimony tended to show that he continuously looked west for the expected train as he drove south toward the crossing; and that he took a second look to the west, when he reached or was upon the passing track, there was no evidence that the trainmen saw or by the exercise of ordinary care could have seen that respondent was looking toward the approaching train. In any case, the evidence shows he was operating the truck and seated on the east or far side of the truck. An inference of obliviousness, which would extend the danger zone beyond the distance necessary to stop the truck short of the path of the train, could be drawn from the movement of the truck as it proceeded over the passing track and the intervening space to the main line at an even speed of 8 or 10 miles per hour. In such situation it was the duty of the trainmen to act upon reasonable appearances and to act at a time when action would be effective to avoid injuring respondent. Perkins v. Terminal R. Ass'n, 340 Mo. 868, 102 S.W.2d 915, 919; Turbett v. Thompson, 363 Mo. 577, 252 S.W.2d 319, 321.

█ As stated, there was some 8 or 10 feet between the main line and the pass-

ing track. The overhang of the train was 1½ feet. We take judicial notice that the standard gauge of railroad track is 4 feet, 8½ inches. Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W.2d 738, 740. If we assume that the front of respondent's truck was at the north rail of the passing track, when respondent shifted gears and decided to go on across, the front of the truck was then some 11 to 13 feet from the overhang of the approaching train. We think the jury could infer and find from this evidence that respondent came into and was in a position of imminent peril at some point after the front of the truck reached the north rail of the passing track; and that it became apparent or should have been apparent to appellant's enginemen from reasonable appearences open to their view that respondent was in imminent peril because of his apparent obliviousness and his apparent intent to enter the path of the train. The exact place where and time when respondent came into a position of imminent peril were questions of fact for the jury. Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519, 525(8).

Appellant next contends that "there was no evidence produced which would show that, as soon as it became or should have become apparent to appellant * * * that respondent was in a position of imminent peril, the engineer or fireman could have sounded a warning of the approach of the train or could have slackened the speed thereof and could thereby have avoided the collision * * *."

▮ "One of the constitutive factual elements of a claim or cause of action under the humanitarian rule is that a defendant (after he knew or, if he had a duty to be on the lookout, after he, in the exercise of the prescribed degree of care, should have known plaintiff was in imminent peril) had the present ability with the means at hand to have averted the impending injury." Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972, 976(5–8); Banks v.

Morris & Co., 302 Mo. 254, 257 S.W. 482, 484; Wapelhorst v. Lindner, supra, 269 S.W.2d 865, 871.

▮ Plaintiff offered no direct evidence tending to show that, after it was reasonably apparent or should have been apparent to the trainmen that plaintiff was in a position of imminent peril, the trainmen had the ability with the means at hand to have sounded a warning or slackened the speed of the train and have thereby avoided the collision. In fact there was no evidence as to the number of cars in the train, or of the time or distance within which the train could have been stopped or its speed slackened. There was no evidence as to the type or kind of brakes, if any, with which the locomotive or train was equipped, and no evidence that the brakes were in good working condition. There was no evidence as to the time required for the brakes to be applied, or to be effective, or the percentage of grade over which the train was operated. While defendant's evidence tended to show that the train came to a stop within 200 to 300 feet beyond the crossing, with no abrupt changes in speed before the collision, there was no evidence as to when the brakes, if any, were applied or to what extent, or where the train was at the time. There was no evidence that the locomotive or train was equipped with any particular kind of a signaling device, such as a whistle, horn or bell, or that any such device was in good working condition and could have been sounded, nor was there evidence of the time required to sound such signal. The cause was not submitted upon primary negligence in not having any such brakes or signaling devices or in not having them in good condition or for any failure to sound statutory signals, but upon humanitarian negligence which seizes upon the entire situation as it actually exists at the moment that reasonably apparent imminent peril comes into existence. Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70, 75(6). The burden rested upon the plaintiff to make

out his case under the doctrine relied upon and not upon the basis of primary or antecedent negligence. It is true that an inference as to the existence of a whistle in good working condition might be drawn or inferred from defendant's evidence that train whistles were heard by defendant's witnesses, but the defendant's evidence, from which such an inference could be drawn, was directly in conflict with plaintiff's evidence that no whistle or other signals were sounded. A plaintiff may not have the benefit of evidence which is directly in conflict with his own evidence and his own theory of the case. Meese v. Thompson, 344 Mo. 777, 129 S.W.2d 847, 850(1). In any event, this court could not take judicial notice that any particular kind of brakes or any type of signaling devices were in good working order and available for immediate use by the trainmen.

Respondent, however, insists that the facts and circumstances shown by the record make this an "almost escaping case", that "any infinitesimal amount of warning, or slackening of speed on the part of appellant's train would have permitted respondent to escape"; and that "under such facts respondent was not required to prove the exact ability of the trainmen to slacken the speed or sound the warning, after respondent reached the position of peril." Respondent cites Woods v. Kurn, Mo.App., 183 S.W.2d 852, 854, 856; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 698, 34 A.L.R.2d 972; Steuernagel v. St. Louis Public Service Co., 357 Mo. 904, 211 S.W. 2d 696, 698; Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70, 74. Some of these cases deal with failure to slacken speed as a proximate cause.

In the Wood case the train struck the rear 2 feet of plaintiff's truck on a crossing while it was proceeding at 5 to 10 miles per hour. There was direct evidence that the train could have been slackened to some extent in 1000 feet, and 10 seconds of time elapsed after imminent peril arose. The court said that, on the record presented, it was for the jury to say "whether a slackening of speed would have avoided the collision." [183 S.W.2d 857.]

In the Stith case, 251 S.W.2d 693, 698, "The experienced operator admitted that he first saw plaintiff when the streetcar was 150' away; * * * and watched him walk 'from that first step till the time the accident happened'; he saw plaintiff start across when the streetcar was 150' away and began to ring the bell 'to give him a warning that I was coming along there,' and to push down on the brakes because 'you never know what might happen.' Thus the operator's own testimony reflected his consciousness of plaintiff's presence and demeanor. * * * The operator's testimony was that plaintiff was stepping over the last rail, and needed only about 1' 6", and 'just a matter of another foot or foot and a half, there wouldn't have been any accident.' As in Diel v. St. Louis Public Service Co., 238 Mo.App. 1046, 192 S.W.2d 608, 611 * * * 'The slightest checking of the speed of the car would have saved plaintiff from harm.'"

In the Stith case the court further said: "Evidence, either direct or circumstantial, is necessary that, in the time and space available, the speed of the streetcar could have (not 'might have') been sufficiently slackened to have enabled plaintiff to have emerged from the imminent peril zone." And see Hunt v. Chicago, M., St. P. & P. R. Co., supra, 225 S.W.2d 738, 741.

The Steuernagel case is not an "almost escaping case," and a comment made in the opinion in that case was overruled in Hunt v. Chicago, M., St. P. & P. R. Co., supra. The Steuernagel case cited State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S.W.2d 864, 867, where the court said: "If the motorman had slackened the speed of his car to 10 miles an hour or less, *as the evidence amply shows he could have*

*done,* plaintiff would have had twelve or more seconds to perform the simple and almost instantaneous act of backing the truck the short distance necessary to clear the approaching car. The circumstances embrace matters of such common knowledge that they speak for themselves without the aid of opinion evidence, and we think it cannot be said that there was no evidence from which the jury might not properly have found that the motorman's failure to slacken the speed of the car was a proximate cause of the collision." (Italics ours.)

In Smith v. Thompson, 142 S.W.2d 70, 74, the court said: "Under respondent's evidence the truck moved across the track at a speed of two miles per hour, or 2.93 feet per second. Since it was struck 3 or 4 feet ahead of the back end, it would have been out of the way in a little more than a second. During the ten or eleven seconds that elapsed while the truck was spanning the 30 or 33 foot distance from where it stopped to where it was hit, the train at a sustained speed of 55 miles per hour (as respondent's witnesses said) traveled 807 to 887 feet. After the collision it came to a stop in about 500 feet. If all this is true, no further testimony was necessary to raise a warrantable inference that the enginemen could have checked its speed sufficiently to have avoided the collision."

The facts in none of these cases are sufficiently similar to the facts shown by this record for the cases to be controlling here. However, we shall assume that appellant's train was equipped with suitable brakes and signaling devices in good condition immediately available for use by defendant's trainmen and we shall examine the whole situation as otherwise shown by the record to determine whether it affords substantial evidence from which the jury would be entitled to find, without resorting to speculation and conjecture, that in the exercise of ordinary care, after reasonably apparent imminent peril to respond-

ent arose, appellant's trainmen could have sounded a warning of the approach of the train or slackened the speed of the train and have avoided the collision and injury to respondent. Respondent insists that "there is ample evidence of a circumstantial nature" to sustain such a finding; and that "the facts are so obvious that expert testimony is not necessary."

If, in moving across the crossing, the respondent traveled at 8 or 10 miles per hour (11.7 or 14.66 feet per second), the front end of the truck would have moved the 11 or 13 feet from the north rail of the passing track to the overhang of the locomotive and train in approximately one second.

▮ Courts take judicial notice that, when a situation demanding some action arises, some appreciable time is required for a motor driver, a motorman or an engineer to react to the appearances of danger and to begin to avoid the situation. Unless a longer time affirmatively appears in the proof, the courts recognize that such reaction time is three-quarters of a second. Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785, 789. We think it is clear that no preventative action to avoid the impending collision could have been taken before the front end of respondent's truck entered the path of the train.

Considering the facts on the theory of "an almost escaping case," it appears from respondent's testimony that respondent riding in the cab of the truck was "pretty near the middle" of the main line track when "it looked like it (the engine) rose out of the ground" and the cowcatcher hit the right rear wheel of the truck. While there is no testimony as to the length of the truck or the location of the right rear wheel with reference to the rear of the truck, we shall further assume that the truck was 14 feet long and the rear axle 2 feet from the rear of the truck. Respondent's theory that the rear 2 feet of the truck were struck by the "overhang" of

the engine is not supported by respondent's own testimony. On the basis of respondent's evidence the front end of the truck moved from the north rail of the passing track to a point approximately 9 feet beyond the south rail of the main line track or a total of 26 to 28 feet before the collision. The truck traveling 8 or 10 miles per hour, 11.7 feet to 14.66 feet per second, traveled this distance in approximately two or two and one-half seconds.

We shall consider first the matter of failure to warn. For a warning to be effective we must add the time necessary for the engineer or fireman to react to the reasonable appearances of imminent peril and determine a course of action, the time necessary to put the intention into action and operate the whistle or bell, the time for the sound to travel from the signaling device to respondent, the time required for respondent to hear and react to the signal and determine a course of action and finally, the time required to "step on the gas" and for the machinery to respond and to move the truck the necessary 5 or 6 feet to clear the overhang of the train. See Vietmeier v. Voss, supra. Only upon a basis of speculation and conjecture could the jury have found that a warning would have avoided the collision. We find there was no substantial evidence that a warning could have been effective to avoid the collision.

On the issue of slackening speed, it will be noticed that, if the train was 300 to 400 feet from the crossing and traveling 35 to 40 miles per hour, when the truck was 35 feet from the main line track and traveling 8 or 10 miles per hour, then the train was traveling substantially four times faster than the truck but had about ten times as far to go and no collision could have occurred since the truck would have crossed ahead of the train. Respondent himself fixed the speed of the truck at 8 or 10 miles per hour, and it is apparent that the speed of the train had to be much greater or its distance from the crossing

much less than shown by respondent's evidence for the collision to occur.

There was no direct evidence as to the location or speed of the train when respondent had reached the point where a jury could have found from appearances that respondent was in imminent peril of the train. The only evidence of the speed of the train prior to the collision was 35 to 40 miles per hour. At 35 miles per hour the train was traveling 51.3 feet per second and, since the jury could have found that respondent's peril should have been apparent to the trainmen when the front of the truck reached the passing track 2 or 2½ seconds before the collision, the jury could find the train to have then been 102 to 127 feet from the crossing. Again we have the reaction time for the engineer to observe the situation, determine a course of action and act to apply the brakes. By this time the train would have traveled some 38 feet and would have been approximately 64 to 90 feet of the crossing. Thereafter, we must consider the time necessary for the brakes to become operative and to slacken the speed of the train and for the train to be sufficiently slowed or delayed in arriving at the crossing for the rear of the truck to clear the overhang of the train. After the reaction time for the engineer, some ¾ of a second, we have from 1¼ seconds to 1¾ seconds for the brakes to become effective and slacken the speed of the train to such an extent that the train would be sufficiently delayed (some ½ second) in reaching the crossing, so that the truck could pass in safety. There is no basis in the record for any finding that an effective application of the brakes could have within the lapse of 1¼ to 1¾ seconds have delayed the train ½ second in arriving at the crossing. We find no substantial evidence in the record to support a finding that appellants' trainmen, after imminent peril arose, could have slackened the speed of the train and have avoided the collision. Hunt v. Chicago, M., St. P. & P. R. Co., supra.

The court erred in not directing a verdict for appellant as requested at the close of all the evidence. It will be unnecessary to consider other assignments. The judgment is reversed.

All concur.