ELLEV SWAIN, APPELLANT, v. HERMAN ANDERS AND CLAUDE NEWINGHAM, RESPONDENTS.—140 S. W. (2d) 730.

Springfield Court of Appeals.   May 21, 1940.

Rehearing Denied, June 6, 1940.

*Claude F. Cooper* and *T. J. Crowder* for appellant.

*R. F. Baynes* for respondents.

FULBRIGHT, J.—This is a suit wherein plaintiff seeks to recover damages for the death of her husband, alleged to have resulted from a collision between the car deceased was driving and a pick-up truck driven by defendant, Claude Newingham and owned by defendant, Herman Anders. Defendants' answer was a general denial and a plea of contributory negligence. The cause was tried to a jury on November 16, 1939, resulting in a verdict and judgment in favor of plaintiff in the sum of $5000. Thereafter, and in due time defendants filed their motion for a new trial which was, on December 5, 1939, sustained on the ground and for the reason that, "The court erred in not sustaining the demurrer offered at the close of the case by the defendants." From the order of the court sustaining defendants' motion for a new trial plaintiff duly appealed.

In her petition plaintiff alleged that on November 28, 1938, her husband, Charles Swain, was driving an automobile westwardly on Highway No. 62, and that defendant Claude Newingham, the agent and servant of the defendant, Herman Anders, was driving a truck belonging to the said Herman Anders, eastwardly along said highway; that the said Claude Newingham negligently caused the truck, by him driven as aforesaid, to collide with the automobile driven by the said Charles Swain and as a direct and proximate result of the collision the said Charles Swain was instantly killed. Among other things, it is further alleged in said petition, "That the said defendant, Claude Newingham, while acting as the agent, servant and employee of the defendant, Herman Anders, and while operating and driving said truck in an eastwardly direction, upon, over and along State Highway No. 62, at the time and place hereinbefore mentioned, saw, or by the exercise of the highest degree of care could have seen the said Charles Swain, deceased, and the automobile in which he was riding and driving, in a position of imminent peril and danger of being collided with, and the said Charles Swain thereby injured and killed, in time thereafter, by the exercise of the highest degree of care, with safety to himself and truck which he was driving, and other persons, to have stopped his said truck or slackened the speed thereof, or swerved the

same, or to have warned the said Charles Swain of the approach of defendant's truck, and the danger impending therefrom, and negligently and carelessly failed to do so.''

The undisputed evidence shows that about six o'clock P. M., November 28, 1938, Charles Swain was driving his automobile (a Chevrolet Coupe) westwardly along Highway No. 62; that he was accompanied by Earle Hadaway, who was seated on his right; that they observed in front of them, headed west, a truck without lights, parked on the north side of the highway, the right wheels of which were about one foot off the gravel; that the defendant, Claude Newingham was driving a truck in the service of Herman Anders, eastwardly along said highway; that the Anders truck and the Swain automobile, being driven in opposite directions on said highway, collided at a point about three miles east of Risco, and that immediately after said collision Swain was found lying partly on the ground and partly on the running board of his car, and that a few minutes thereafter he died. It further shows that the defendant Newingham was employed by defendant Anders and at the time of the collision, was engaged in the service of Anders; that the Anders truck was equipped with mechanical, four wheel brakes in good condition and that the truck was loaded with 50 pounds of flour and about $3 worth of groceries; that the highway at the point of the collision was level and straight both east and west; that it was paved with gravel, the gravel portion being about 35 feet wide, and was dry; that the evening was clear and visibility good; that at the time of the collision it was dark and both cars were driven with head-lights; that the collision occurred from five to twenty feet in front of or to the west of the truck which was parked on the north side of the road.

Earle Hadaway testified in part as follows, as disclosed by plaintiff's abstract of the record:

''That evening, about six or six-fifteen, there was a collision between Swain's car, in which we were riding, and a truck belonging to the defendant Anders, and which was driven by Claude Newingham. The collision occurred at a point on said Highway No. 62 about three and one-half miles east of Risco. At the place of the collision the road was paved with gravel, and the gravel part of the roadbed was 35 feet wide, that is, from the north edge to the south edge of the gravel. There was a dirt shoulder about three feet wide on the south side of the road, and then a gradual slope of about 15 feet to the bottom of a ditch, which was about 3 or 3½ feet deep. The slope was gradual and even. The road was dry and solid. For some distance, both east and west of the place of collision, the road was straight and level. We were traveling west and the truck that struck our car was traveling east. We were traveling on the north side of the road on the gravel portion, and traveling at about forty-five miles per hour. I saw a truck parked on the north side of the road; it had no lights, and I said,

'Look out, there is a truck without lights.' We were then about three or four hundred feet from the truck. Swain began to slacken his speed to go around the truck, and when we approached the truck within forty or fifty feet, he turned to the left and started around it at a speed of about twenty or twenty-five miles.

"When we turned out in the road to go around the truck and were about even with it, I saw the lights of a truck approaching us from the west. It looked to be four or five hundred feet west, and was coming toward us; it looked like it was coming about fifty or sixty miles per hour. Mr. Swain and I were not saying a word. I was looking at the oncoming truck and I did not look at Mr. Swain. Q. Mr. Hadaway, state to the jury, if you know or if you are able to estimate how far Mr. Swain got his automobile to the south side of the road in going around the parked truck. A. Well, like I said, I don't think "he was over the center of the road. Q. Was his automobile struck? A. Yes, sir, when he turned back north ahead of the parked truck. Q. When he turned back north, where was he with reference to the parked truck? A. About twenty feet ahead of the parked truck. Q. When your car was struck, about what position was it in the road? A. Well, the front was headed north in front of the truck; he was getting back to his side of the road. At the time our car was struck it was headed northwest, and the truck that hit us was traveling east. Q. What part of the road was it in when it was struck? A. It was on the north side of the center of the road."

He also testified that he had driven automobiles and trucks for many years and it was his opinion, based upon this experience, that any truck equipped with mechanical four-wheel brakes, in good condition, and loaded with 50 pounds of flour, could have been stopped with safety within the following distances: if traveling 60 miles per hour, about 160 feet; 50 miles per hour, 110 feet; 40 miles per hour, about 75 feet; 30 miles per hour, about twenty feet. On cross-examination he testified: "I saw the parked truck when we were about 40 to 50 feet behind it. I said, 'Charley, yonder is a truck parked.' He made no response but began to slow down. Q. I believe you stated a moment ago that Anders was coming about 60 or 65 miles per hour? A. Yes, sir, that is my opinion about it. I examined the Swain car and truck immediately after the collision. The car was cross-ways in the road and the truck was setting off the road with the front wheels at the edge of the gravel and the back-end down in the ditch on the south side of the road."

Winford Bennett, 18 years of age, testified that at the time of the collision he was standing at the corner of his house a few feet south of the highway. He saw the Swain car traveling west, the defendant's truck traveling east and also saw the collision. He did not know how many feet the Swain car was east of the parked truck when he turned to go around the parked truck, but it was "pretty close." He made

no estimate of the speed of the car but stated they were traveling at about the same rate of speed. Q. "Did you see the Swain car when it turned out to pass the truck? A. Yes, sir. Q. How close would you think it was to the truck when he pulled out? A. I don't know. It looked like he was pretty close before he noticed it. Q. Where was the Anders truck when you first saw it? A. It was in front of our house when I first saw it. It was traveling east. Q. When you first saw the truck in front of your house, where, then, was the Swain car? A. It was still behind the parked truck. Q. How fast do you think the truck was traveling? A. I don't know, but they were both going about the same, I imagine. . . . Q. State to the jury whether or not in your judgment, that Ander's truck slowed down any? A. I don't know whether it did or not."

He further testified, on re-direct examination that he stepped the distance between where the collision occurred and up even with the house where he first saw the Anders truck, but had forgotten how many steps it was. He made no estimate of the distance his house was from the parked truck or the direction. On cross-examination he testified that there was a ditch between his house and the highway and that there was a fence on the south side of the ditch; that he was south of the fence; that he saw the Swain car coming from the east and another car from the west; both cars had headlights. The Swain car was traveling on the north side of the road before the collision. "Q. Did it pull up right behind the parked car, then pull out to the left to go around? A. That's the way it looked to me. Q. When it did that, the car coming from the west was out there? A. Yes, sir. Q. And then went together? A. Yes, sir. Q. At the place these cars went together, they were on the south side of the road? A. Yes, sir. Q. The Swain car came up by the parked truck and immediately turned to the left to go around, and right then the accident occurred? A. No, sir, it was when he started to pull back to his side." Witness also testified that immediately after the collision the parked truck pulled around north of the Swain car and drove off; that on one occasion he saw a car placed on that road to see how many cars could be put side by side on it. "Four cars could be placed side by side. I saw that tested." That he saw skid marks of the Swain car on the south side of the road, but couldn't say how far south.

Claude Newingham, one of the defendants and driver of the Anders truck, stated that it was loaded with 50 pounds of flour and groceries that amounted to about $3; that it was a Ford V-8; that prior to the accident he noticed the Swain car traveling west, in his judgment, about a hundred yards on the other side of the parked truck on the road. "I judge the collision occurred right around the front of the headlights of the parked car. Q. Then, if I understand you, it was just west of the parked car? A. Just a little. Q. On what side of the road did it occur? A. On the right hand side. That would be

on the south side of the road.'' That, in his judgment, when he first saw the Swain car, east of the parked truck, he was about the same distance west, traveling on the right hand side of the road, at a speed of about thirty or thirty-five miles per hour. ''When I seen I was going to hit him, I jerked the steering wheel and applied the brakes. I had been traveling about thirty or thirty-five.'' He testified that he was going down in the ditch the last thing he remembered, on the right hand side (south side); when he got around this car, the back-end flew around and that is when they hit. Q. ''When did you first notice him coming over on the south side of the road? A. Well, whenever he jerked around this parked car he like to went in the ditch; if he had went on in the ditch, wouldn't either one hit, but he swung back to try to get on his side of the road. When I saw he was attempting to come around the parked truck, I applied the brakes and jerked towards the ditch as hard as I could.'' On cross-examination, he stated: ''Q. How close was he to the parked truck when he turned to go around it? A. I judge 10 or 12 feet. Q. He was then directly behind the truck? A. Yes, sir. Q. He ran in 10 or 12 feet of it, going about thirty miles per hour. A. Thirty or thirty-five.'' He further testified that in his judgment the truck he was driving could have been stopped on that road traveling at 30 miles per hour in 50 or 75 feet; that another person was in the truck with him.

Mr. Hadaway, having been re-called by plaintiff, testified on cross-examination, in part as follows: ''Q. Now, Earle, have you ever checked the distance in which a car described to you by Mr. Crowder, could be stopped? A. No, sir. I have never checked it. Q. Have you ever measured the distance? A. No, sir. Q. Have you ever seen it done? A. I have seen them stopped in less space than that. Q. Have you ever measured the distance? A. No, sir. Q. Don't you know, as a matter of fact, a car traveling thirty miles per hour, equipped with four-wheel brakes, under the conditions described, can't be stopped in less than fifty feet? A. No, sir. I don't know it. Q. You are not saying that isn't right, are you? A. No, sir.''

No evidence was offered on the part of the defendants. At the close of plaintiff's case, defendants offered their demurrer to the evidence, which was, by the court, overruled, and the cause submitted to the jury solely under the humanitarian doctrine.

Plaintiff assigns as error the order of the court sustaining defendants' motion for a new trial on the ground that the court erred in overruling defendants' demurrer to the evidence. At the threshold therefore, we are called upon to determine whether or not there was sufficient evidence to submit the case to the jury.

The law is well settled that ''A defendant's demurrer to plaintiff's evidence admits as true every fact and circumstance which plaintiff's evidence tends to prove; that plaintiff is entitled to the benefits of every inference of fact which may reasonably be drawn therefrom;

that the evidence must be considered in the light most favorable to the plaintiff and that such a demurrer can be sustained only when the facts in evidence and the legitimate inferences to be drawn from such facts are so strongly against plaintiff as to leave no room for reasonable minds to differ." [Young v. Wheelock, 64 S. W. (2d) 950, l. c. 954; Hurst v. Montgomery Ward & Co., 107 S. W. (2d) 183.] It is also true that under the humanitarian doctrine neither the court, in ruling on the demurrer, nor the jury in determining the question of facts submitted to them, are required to gauge with fine accuracy the time and distances, or the feet and seconds in determining whether the defendant could have stopped his truck, slackened the speed thereof or swerved to the right and thereby avoided injury to the deceased. [Johnson v. Scheerer, 109 S. W. (2d) 1231; Steger v. Meehan, 63 S. W. (2d) 109.]

On the other hand, a case should not be submitted to the jury under the humanitarian doctrine upon mere suspicion, guesswork or conjecture. [McCoy v. Home Oil & Gas Co., 60 S. W. (2d) 715; Sheppard v. R. R. Co., 72 S. W. (2d) 985.] Nor does the rule applicable to a demurrer to plaintiff's evidence relieve plaintiff of the necessity of producing substantial testimony to prove the issues. [Near v. R. R. Co., 168 S. W. 1186.]

Keeping in mind the above, we are convinced that the trial court did not err in overruling defendant's demurrer to the testimony. There was ample evidence given, as heretofore set out, to make a submissible case on primary negligence, but we find no substantial evidence in this record that justified the trial court submitting the cause to the jury under the humanitarian rule. There is no evidence upon which a jury could base its conclusions that defendants saw the deceased in peril in time to have, by the exercise of the highest degree of care, protected the deceased from injury.

Hadaway testified that they were passing around the parked truck and were even with it when they first discovered the defendant's truck approaching from the west, some four or five hundred feet away. Certainly the deceased had ample time to reach the north side of the road, ahead of the parked truck before defendant's truck, running at 50, or even 60 miles per hour could have reached the point of the collision. He is the only witness by which plaintiff undertook to establish the more essential facts necessary to submit the case on the humanitarian theory. On direct examination he testified that when he first saw the parked truck on the north side of the road the Swain car was three or four hundred feet from it; that he said, "Look out, there is a truck without lights." That Swain began to slacken his speed to go around the truck and when within 40 or 50 feet he turned to the left and started around it at a speed of about 20 or 25 miles per hour. On cross-examination, he testified: "I saw the parked truck when we were about 40 to 50 feet behind it and said, 'Charley,

yonder is a truck parked.' He made no response but began to slow down.'' On direct examination he testified that the on-coming Anders truck was four or five hundred feet to the west when they were even with the parked truck and traveling 50 or 60 miles per hour. On cross-examination he stated that it was his opinion the Anders truck was coming at 60 or 65 miles per hour. In his cross-examination, relative to the distance in which the truck that collided with the car in which he was riding could have stopped, we find the following: ''Q. What did you mean a moment ago when you told me you wasn't positive about the thirty miles per hour speed or being able to stop in twenty feet? Mr. Cooper: I object to the form of the question. The Court: Court will let him answer. Mr. Cooper: Exception. I told you it would stop in twenty feet; I didn't tell you it would take fifty feet. Q. Will you tell the jury one time when you measured the stopping distance of a car like the one you described and on a road like has been described? Mr. Crowder: I object for the reason the measurement of the distance or the estimate of a distance is a mere estimate and the witness may testify without any measurement. The Court: Counsel has a right to cross-examine him on his estimate. Mr. Crowder: Exception. No, I haven't measured it; I never did; no, I never did measure the stopping distance of a car traveling sixty miles per hour; I never measured the stopping distance of a car traveling fifty miles per hour; yes, I was merely guessing.''

The distance in which the Anders truck could be stopped with the means at hand and under the existing circumstances and surroundings, was a vital fact to be established by substantial and dependable evidence and should not be based upon the statement of a witness who says he was ''merely guessing.''

The evidence, here relied upon to establish a submissible case under the humanitarian doctrine, is largely guesswork and conjecture. A glaring example of its inaccuracy and uncertainty is reflected by the colloquy between the trial judge and the witness Bennett. While testifying, the court asked the witness to look out the window and indicate some object that was about the same distance away, as he was when standing at the corner of his house from the point of the collision. Witness pointed out a certain house, whereupon the court asked: ''How many of you want to guess how far it is from here to that little house? Mr. Crowder (Attorney for Plaintiff): I don't have much idea. The Court: I would say 250 feet. A juror: Four or five hundred feet.''

While, as heretofore observed, the jury is not required to gauge with fine accuracy the time and distances, or feet and seconds, yet there must be some substantial evidence upon which to base their conclusions. The point at which witness first observed the parked truck is material, in that the closer thereto, the more abrupt the turn to the left would have been to pass around the truck. The speed at which

the Anders truck was traveling is important to determine the length of time it would require to cover the space of four or five hundred feet from the point where it was first observed to the place of the collision. When a witness testifies one way in one breath and a different way in another, it destroys the probative force of his statement and leaves the jury to guess, speculate and conjecture as to which of the conflicting statements are correct.

''Where a party relies on the testimony of a single witness to prove a given issue and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction and no other fact and circumstance in the case tending to show which version of the evidence is true, no case is made and the jury should not be permitted to speculate or guess which statement of the witness would be accepted.'' [Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; Roehl v. Ralph, 84 S. W. (2d) 405; Seitz v. Hudson, 106 S. W. (2d) 523.]

Moreover, there are no facts established from which the jury could reasonably infer when or where deceased reached a position of imminent peril. Imminent peril does not mean remote, uncertain, contingent, nor (for the person affected) avoidable danger. It means certain danger, imminently impending and admits of no time for deliberation on the part of the person in peril, between its appearance and the impending calamity. As thus defined it must be established.

''The constitutive facts of a cause of action under the humanitarian rule, stated in their simplest terms, without any of the refinements, limitations or exceptions which might arise on a particular state of facts, are contained in this formula: '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant, after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' '' [Banks v. Morris & Co., 302 Mo. 234, l. c. 273; McCoy v. Gas Co., 60 S. W. (2d) 715.]

The burden was on the plaintiff to make proof of facts and circumstances tending to make a submissible case under the humanitarian rule. She failed to do so. Therefore the court erred in submitting instructions to the jury on that theory. [Sheppard v. Ry. Co., 72 S. W. (2d) 985.]

From the foregoing considerations we hold that the trial court did not err in overruling defendants' demurrer at the close of plaintiff's case; that the evidence adduced was sufficient to submit the case on primary negligence; that it was insufficient to make a submissible case under the humanitarian rule; that defendants' motion for a new trial

was properly sustained, notwithstanding the grounds upon which the court predicated its action. The judgment is accordingly affirmed and the cause remanded for a new trial. *Tatlow, P. J.*, and *Smith, J.*, concur.