Florence Louise HARRELLSON and Florence Louise Harrellson, Administratrix of the estate of Glenn Harrellson, Plaintiff-Appellant,

v.

Barbara Hopkins BARKS, Defendant-Respondent.

Florence Louise HARRELLSON and Florence Louise Harrellson, Administratrix of the estate of Glenn Harrellson, Plaintiff-Respondent,

v.

Barbara Hopkins BARKS, Defendant-Appellant.

Nos. 7740, 7744.

Springfield Court of Appeals.

Missouri.

June 26, 1959.

Motion for Rehearing or in Alternative to Transfer to Supreme Court Overruled July 31, 1959.

Riddle & Baker, Malden, Briney & Welborn, Bloomfield, for Florence Louise Harrellson.

Powell & Jones, Dexter, for Barbara Hopkins Barks.

RUARK, Judge.

These are two cases which involve the appeals of opposing parties from the same judgment. Since there can be only one judgment, the cases are consolidated, but in purpose of hoped-for clarity they will be considered as separate cases.

Case No. 7740 is plaintiff's appeal in a humanitarian negligence intersection case. Plaintiff obtained a verdict on two counts which were concerned with personal injury and one count which was concerned with property damage. The court thereafter sustained defendant's motion for judgment in accordance with motion for directed verdict at the close of the evidence on the counts which concerned personal injury and, in the alternative, sustained defendant's motion for new trial in respect to such counts. In this, plaintiff's appeal, the first and principal question is whether plaintiff made a submissible case.

*The scene of the accident* is well depicted by a scale map or plat which plaintiff placed in evidence. This shows the intersecting streets, sidewalks, and the houses on the four corners. Most of the distances and measurements are marked on the plat by the engineer. Where they are not set forth it is not difficult to arrive at distances by use of the scale.

Both streets are asphalt or bituminous substance. The pavement on Castor Street, which runs east and west, is 20 feet wide. The pavement on Mulberry, which runs north and south, is 19 feet wide on the north and 21 feet wide on the south of the intersection. Thus the paved intersection proper, that is, that portion of the crossing common to both streets,[1] is approximately 20 feet square, although the corners are rounded. The sidewalks on each side of Mulberry (the north-south street) sit back 14 feet from the pavement. The sidewalks on Castor Street (the east-west street) sit back 24½ feet on the south side, 18 feet on the (west) north side of the intersection, and 26½ feet on the (east) north side. Between the sidewalks and the pavement are gradually sloping ditches.

The pavement was dry. Plaintiff was going south on Mulberry in a two-door "Hudson Rambler," and the defendant was driving east on Castor in a Mercury. The automobiles came together near the center, but in the southwest quadrant, of the intersection.

*Plaintiff* testified that she drove her Hudson south down the west side of Mulberry Street at a speed of 20–25 miles per hour. As she approached the sidewalk which runs down the north side of Castor Street she applied her brake and slowed her automobile, not to a complete stop, but slow enough that she could, and did (by manual shift), shift her car into second gear. She looked to the west (her right) and saw the defendant, Barks, approaching from the west. She did not estimate the speed or distance of the Barks car but said it was opposite the third house down the street. After seeing the Barks car and shifting into second gear, she "just eased on through the intersection" at a speed which she estimated at 15–20 miles per

1. Pennington v. Carper, Mo., 309 S.W.2d 596, 600; Wilson v. Toliver, 365 Mo. 640, 285 S.W.2d 575, 579.

hour. She looked to the left but did not look back to the right until she "heard a noise." At that time the defendant's car was almost upon her. She (plaintiff) started to swerve to the left, and almost immediately her car was struck at the right door, opposite the driver. She says that at the time of the impact she was on her right (west) side of Mulberry Street and "the front part of" her car was past (south of) the (east-west) center of the intersection. Neither the testimony nor plaintiff's plat shows the distance between "the third house down the street" and the intersection. The distance from the north line of the intersection proper to the north line of the sidewalk, slightly north of which plaintiff looked and saw defendant, braked, slowed, and shifted into second gear before proceeding forward, is 22 feet.

Other facts to which plaintiff testified were that, as she came into the intersection:

"Q. And you could have turned to the left there, * * *? A. Yes, I could have made a left-hand turn there.

"Q. And you could have put your brakes on and stopped before you got down to where you collided, couldn't you? A. More than likely I could have made a stop if I had known she was going to hit me."

*Defendant* testified that she turned on Castor Street one block west, that she came down the street at 20–25 miles per hour, but slowed down to 15 or 20 miles per hour as she approached the intersection; that as she was between the sidewalk and the intersection and the front of her car was near the west intersection line she first saw plaintiff's car, north of the sidewalk on the north of Castor (the approximate place she marked was some 26½ feet north of the intersection); that she immediately applied her brakes and went forward in a continuous skid across the west lane of Mulberry Street to the point of impact. She said her skid marks extended from the sidewalk line to point of impact, and in this she was supported by a picture exhibit

and the testimony of a police witness. She said her brakes were in good condition.

The only *stopping distance* proved was that of defendant's Mercury based on 20 miles per hour. This distance is 22 feet reaction time and 18 feet braking distance.

*Plaintiff's witness Buford Brown* testified in reference to plaintiff's map Exhibit A. He said he observed the collision from the front porch of the second house east on the north side of Castor Street. He was some 100 feet northeast of the center of the intersection.

He was alerted to the probability of impending collision by the sound and scream of defendant's tires on the pavement ("and she left black marks"). He said, "That's how come me to look up * * * and I heard these tires and I looked up and the Mercury was the first I saw." He did not estimate the distance in feet defendant's Mercury was west of the intersection, but the witness was "oriented" to the first house west of the intersection on the south side of the street and he placed an X opposite this house as the place where he first saw the Mercury after his attention was attracted to it. The engineer's measurement markings extend only 60½ feet west of the intersection, but, by scale, the place where the witness first saw the skidding Mercury ("she rode her brakes") was approximately 68 feet from the west edge of the intersection. His estimate of the Mercury's speed as it (obviously skidding) approached the intersection was "between 25 and 30" miles per hour.

At approximately the same time he saw plaintiff's Hudson Rambler. It was then, as he said, its front end at a place which he marked approximately even with the south line of the sidewalk extending along (the west portion of) the north side of Castor Street and 18–20 feet from the north line of the intersection. She, plaintiff, crossed the intersection at a speed "going right at 20."

The next position he gives is when plaintiff's Hudson was "right in the middle of

the intersection," about a foot from it. He says that at that time the defendant's car was about 10-15 feet from the point of impact. The defendant let up on her brakes, the front of her car came up, and it ceased slowing its speed. He placed the point of impact at a place which is a little north of the center of the south half of Castor Street and a short distance west of the center line of Mulberry Street. He said that at the time of the collision the plaintiff had her left wheels "just a little over the center line of Mulberry Street." He *also* said that defendant's eastbound skid marks ended slightly east of the sidewalk on the west side of Mulberry and extended back (west) therefrom a distance of 20-25 feet.

The witness was presented with defendant's exhibit picture, which shows clear and unmistakable tire marks extending continuously across the west side of Mulberry up to the point of collision. He said he would not say they were there that day like that as far as he knew; that he wasn't sure of that, but "I'd say she let up on her brakes." The whole import of his testimony, however, is that defendant did let up on her brakes some 10 or 15 feet west of the point of the impact. The witness stated he did not know defendant's speed after she let up on her brakes.

■ As to the zone of peril, the defendant was on the right. There is no evidence of stop or traffic control markers.

The plaintiff looked and saw the defendant approaching. She was not oblivious and the zone of peril was therefore considerably shortened. It did not begin until plaintiff was so close to the pathway of defendant's car that it was certain she could not stop, slacken speed or swerve and avoid the collision.[2] The plaintiff braked and slowed her car at the approximate sidewalk line, shifted into second gear, and continued forward at a reduced speed. In determining the zone of peril the defendant's duty arose, and she was entitled to act, upon "reasonable appearances."[3] The plaintiff testified that she could have turned to the left.[4] She also testified that "more than likely" she could have stopped her car before the collision if she had known the defendant was going to hit her.[5]

■ These facts no doubt influenced the plaintiff to choose her theory and submit (by her main instruction) upon the proposition that plaintiff came into imminent peril *when she entered the intersection.* Hence in determining humanitarian negligence in this case we do not concern ourselves with the actions of the parties, as antecedent negligence, prior to the time the front part of plaintiff's car entered into the intersection. That is the time and place the humanitarian doctrine fixes and seizes upon, and it is (only) the conduct of the parties from and after that time and place which can concern us in determining liability.[6] However, we find that we are required to be concerned with matters ante-

2. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47; Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S.W.2d 296, 300; Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73, 75-76; Thomas v. Aines Farm Dairy, Mo.App., 257 S.W.2d 228; Banks v. Koogler, Mo., 291 S.W.2d 883; Homfeld v. Wilcoxon, Mo., 304 S.W.2d 806; Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546; Dister v. Ludwig, 362 Mo. 162, 240 S.W.2d 694, 699.

3. Perry v. Dever, Mo., 303 S.W.2d 1; Farmer v. Taylor, Mo.App., 301 S.W.2d 429; Turbett v. Thompson, 363 Mo. 577, 252 S.W.2d 319, 321; Hayes v. Coca-Cola Bottling Co., Mo., 269 S.W.2d 639,

642; Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889.

4. See Ziegelmeier v. East St. Louis & Suburban Ry. Co., 330 Mo. 1013, 51 S.W.2d 1027; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33, 35.

5. See Gosney v. May Lumber & Coal Co., 352 Mo. 693, 179 S.W.2d 51, 53; Thomas v. Aines Farm Dairy, Mo.App., 257 S.W.2d 228, 233.

6. Batson v. Ormsbee, Mo.App., 304 S.W.2d 680; Zickefoose v. Thompson, 347 Mo. 579, 148 S.W.2d 784; Spoeneman v. Uhri, 332 Mo. 821, 60 S.W.2d 9, 11; Hagerman v. Rodgers, Mo.App., 101

cedent to the time plaintiff set her front wheels on or across the intersection in attempting to find (a) where was the defendant at that time?; (b) at what speed and under what circumstances was the defendant then traveling?, in order to ascertain whether or not the evidence shows or permits reasonable inference that at the time plaintiff entered the intersection the defendant could, with the means at hand and with safety to herself, have avoided collision by stopping, slowing, or swerving her automobile. In determining these two questions we must give the plaintiff the benefit of all favorable evidence and inferences which are not contradictory of her own theory or contrary to physical facts.[7]

We have said the plaintiff and her Hudson entered the zone of peril when she entered the intersection. It took her only 10 feet to reach the center of that intersection. Plaintiff says the impact occurred when the front of plaintiff's car was across the center line. Exactly how far we do not know, but the impact was at the door, about the center of the car on the right side. The place where plaintiff's witness Brown marked the point of impact on the plat scales to about four and a half feet south of the center line. We can safely infer, we think, without resorting to speculation, that the front of plaintiff's car must have been some eight or nine feet across and south of the center line in order to place her car where it could be struck in the right door. This left her traveling a total distance of some 18 or 19 feet within the zone of peril. Calculating her speed at the lowest she gave (15 miles per hour), it took her less than a second to cover this distance.

But where was defendant and how fast was she going when plaintiff launched this voyage into danger? No witness tells us. If we attempt to figure backward, the plaintiff says that when she was some 22 feet north of the intersection she saw the defendant an unmeasured distance down the street driving at an unmeasured speed. That is of no help. Defendant says that when the front of her car was near the west intersection line the plaintiff had not yet reached it, and that is of little help to the plaintiff. In computing the distance which defendant had yet to travel before impact we must cut off and subtract from the width of the west lane of Mulberry Street the width of plaintiff's car in so far as it occupied such lane. Giving her the most favorable version and assuming she had her left wheels across the imaginary center line on the left (east) side of the road, we must still subtract something like four feet from the distance, thus leaving defendant's approximate traveling distance within the intersection and across the west lane of Mulberry Street not much in excess of six feet.

■■ *So* we must turn to the testimony of the witness Brown, and here we are met with confusion, contradiction, and uncertainty. He says he first saw defendant (then skidding) down the street some 68 feet west of the intersection, going 25–30 miles per hour. Plaintiff was then 18–20 feet north of the intersection and approaching at a speed of 20 miles per hour (his estimate). The parties should not be too strictly bound by estimates of speed and distance.[8] But the witness located defendant's car, at the time he first heard and saw it, by reference to *a fixed point,* and that is a subject of exact measurement. At that place the plaintiff was riding her brakes and her tires were screaming (it was the noise which first attracted his notice). Such

S.W.2d 526; Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W. 2d 70; West v. St. Louis-San Francisco Ry. Co., Mo., 295 S.W.2d 48, 52.

7. Fenneren v. Smith, Mo., 316 S.W.2d 602; Catanzaro v. McKay, Mo., 277 S.W. 2d 566.

8. Fisher v. Gunn, Mo., 270 S.W.2d 869, and cases cited loc. cit. 874; Caffey v. St. Louis-San Francisco Ry. Co., Mo. App., 292 S.W.2d 611, 617.

being the case, the defendant had already used up her reaction time. We do not have the braking distance at the speeds the witness gave (25–30 miles per hour), but we have a comparison in the evidence (braking distance at 20 miles per hour) and we can take judicial notice of the *limits* of braking distance.[9] And it would appear that, at the commencing speed to which the witness testified, the defendant's car, with her brakes down, would have come to a complete stop before reaching the place near the intersection where he says defendant took her foot *off* the brake. But later the witness said the east line of skid marks ended at a point east of the sidewalk and extended back (west) a distance of 20–25 feet. The only braking distance proved was 18 feet at 20 miles per hour.

We follow the cars closer to the point of impact. Now the witness Brown says the plaintiff is one foot north of the center of the intersection on the west lane, moving into defendant's path at 20 miles per hour (29 feet per second) and has some 9 or 10 feet to go before reaching the point of impact. At *that* time, according to the witness, the defendant is some 10–15 feet away. At his estimate of plaintiff's speed the impact will occur in approximately one-third of a second. But in order to know if the jury could have found that defendant, from and at that point in time, could have stopped, slackened speed or swerved in order to avoid the collision they necessarily had to know the speed defendant was traveling. Taking the statement that defendant was 10 feet away from impact point, the defendant would have had to travel as fast as the plaintiff was going in order to reach that point. The witness said plaintiff was going 20 miles per hour. The plaintiff proved that the *braking* distance of defendant's car at that speed was 18 feet. So defendant could not have stopped by continuing to bear down on her brakes. If we take the longer distance given by the witness (15 feet), the defendant would have

been required to travel at a faster rate of speed in order to reach point of impact, and this would necessarily have required a greater stopping distance, although we have no evidence as to what it would have been. Hence, whether the defendant could have stopped her car is, to say the least, conjectural and speculative.

This brings us to the question of whether she could have slackened her speed or swerved or combined the two sufficiently to evade the collision in this fraction of a second after the defendant (so the witness says) let up on her brakes in the last 10–15 feet. As we have stated, we do not know defendant's speed, but we have calculated the time interval from the stated position of the plaintiff's car and its speed and the distance it traveled as less than a second. The collision occurred with considerable force, sufficiently so as to justify an agreed repair bill on the part of the plaintiff in amount of $825. In other words, defendant's car did not "creep" this last 10–15 feet and "nudge" the plaintiff's vehicle. It was going at an appreciable rate of speed. To escape the path of defendant's car, the *rear* of plaintiff's automobile must have passed over the middle of the intersection and the greater portion of the south lane of Castor Street. There is no way that it can be inferred without resorting to sheerest speculation that the defendant could, in the fraction of a second involved, have slackened her speed sufficiently to allow the plaintiff's car to complete its passage and escape the collision. The nearest it can be said is that she *might* have, depending upon the speed she was traveling at this point.

Then we consider whether the jury might have reasonably inferred that defendant could have swerved sufficiently to avoid collision. Plaintiff occupied a portion of the west lane of Mulberry Street. If defendant swerved to the left, she met the plaintiff coming and so shortened the time and distance in which the cars would meet

9. Perry v. Dever, Mo., 303 S.W.2d 1, 7 (14); Mallow v. Tucker, Mo., 281 S.W. 2d 848; Peterson v. Tiona, Mo., 292 S.W.2d 581.

on this narrow space. If (assuming she had time to do so) she swerved to the right, she extended the time and place in which plaintiff would proceed across the south lane of Castor Street. Thus the space of opportunity for collision was extended. *Perhaps* the defendant may have been able to so slacken speed and swerve and so avoid the collision, and if a verdict can be rendered upon such conjectural "perhaps," then plaintiff made a submissible case.

■ But there must be more than a "perhaps" or mere possibility of liability, for the verdict cannot be based upon speculation or conjectural surmise.[10] And if the evidence is so indefinite that either liability or nonliability may be equally inferred, no case is made.[11]

■■ A humanitarian negligence case involving moving automobiles necessarily involves speed and distance or position of the cars, and ability to avert, sufficiently definite in each respect that they may be combined as an intelligible whole. When one is lacking, the picture is not complete, for the plaintiff is required to prove every element of her case.[12] And when these essential elements do not, in and of themselves, mesh together in making a physically factual situation of liability, we cannot, simply because the collision occurred, aim-lessly and without evidence in support, slide the time, distance, and speed back and forth or lengthen or compress them, in the hope of making them fit together somehow by the hazard of guess.[13]

" * * * under the circumstances here only by dissecting seconds into fractions, only by conjecture and speculation, only by guessing at the distance between these two vehicles at a certain instant could the jury have found that defendant could have avoided this collision after plaintiff, fully aware of her approach, drove into her path." Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, 498.[14]

■ It is our conclusion that the trial court was correct in holding that the jury could not have arrived at a verdict in this case without indulging in sheer speculation. However, we believe that plaintiff should not be completely foreclosed unless it is apparent that a recovery cannot be had. Under the state of the evidence in this case we believe it would be in the interests of justice to remand the case for a new trial.

No doubt the questionable features complained of in plaintiff's instructions will be eliminated on such retrial, and there is no need to lengthen this opinion by considering them.

10. Berry v. McDaniel, Mo.App., 269 S.W. 2d 666, 670; Stephens v. Thompson, Mo., 293 S.W.2d 392, 394; Paydon v. Globus, Mo., 262 S.W.2d 601; Glenn v. Offutt, Mo.App., 309 S.W.2d 366; Yeaman v. Storms, 358 Mo. 774, 217 S.W. 2d 495, 499; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33, 35; Davis v. McClanahan, Mo.App., 262 S.W.2d 65, 69–70.

11. Vietmeier v. Voss, Mo., 246 S.W.2d 785; State ex rel. Dutcher v. Shelton, 249 Mo. 660, 156 S.W. 955, 965; Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 561; Zimmerman v. Young, Mo.App., 280 S.W.2d 457, 461; Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663, 672; Helton v. Huckeba, 241 Mo.App. 786, 270 S.W.2d 486, 495; see Swain v. Anders, 235 Mo.App. 125, 140 S.W.2d 730; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644.

12. See Barnes v. Vandergrift, 264 Mo. 829, 269 S.W.2d 13, 16; Branscum v. Glaser, Mo., 234 S.W.2d 626; Thomas v. Aines Farm Dairy, Mo.App., 257 S.W. 2d 228, 235; Breshears v. Myers, Mo., 266 S.W.2d 638; see Mallow v. Tucker, Mo., 281 S.W.2d 848, 851; Bibb v. Grady, Mo.App., 231 S.W. 1020, 1022; Hawkins v. Wells, Mo.App., 297 S.W. 193, 196.

13. See Bauer v. Wood, 236 Mo.App. 266, 154 S.W.2d 356, 359; Krause v. Pitcairn, 350 Mo. 339, 167 S.W.2d 74, 79; Stephens v. Thompson, Mo., 293 S.W.2d 392, 395.

14. See also Turbett v. Thompson, 363 Mo. 577, 252 S.W.2d 319, 323; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33, 35; Goodson v. Schwandt, 318 Mo. 666, 300 S.W. 795, 796.

*As to Case No. 7744 (defendant's appeal):*

The first several of defendant's contentions concern plaintiff-administratrix's recovery for damage to the automobile on a primary negligence submission. They are based upon the contention that the car which plaintiff was driving was purchased with funds withdrawn from a joint account; that—presto!—the wife was a joint owner of the vehicle, and that consequently (a) the wife was a necessary party, along with the administratrix, in suing for damages to the car (this point, incidentally, was not raised in the lower court); and (b) the negligence of the wife as joint owner was imputable to her husband.

The plaintiff testified that the title to the car was in the husband. The *only* evidence upon which defendant bases her claims is a portion of the cross-examination of plaintiff, which was as follows:

"Q. This automobile you were driving, you say the title was in your husband's name? A. Yes.

"Q. Did you have any interest in it actually? A. Why, I guess as being his wife I had an interest in it, but it was in his name.

"Q. Had you put some of the money into it to buy it? A. Well, I mean we both worked and we both had a bank account together.

"Q. It came out of your joint account, is that right? A. Yes, sir.

"Q. And you both put money in this joint account? A. Yes."

■ That *title* to the car was in the husband's name seems undisputed. This being so, the natural inference and presumption would be that the husband was the legal and equitable owner, for the purchase of an automobile by one who does not take certificate of title is unlawful and void.[15] So, immediately, in order to uphold defendant's contention, we must assume either (a) the wife willingly, in violation of the law, took an interest or (b) the wife was wronged by her husband when he took title in his own name.

In regard to this purchase the defendant relies upon the testimony of the plaintiff that "we both had a bank account together." The words "joint account" are the words of the cross-examining lawyer, not the witness. The *form* of the account is not shown, nor was any effort made to show it.[16] The expression "joint account" is, by long continued common usage, a rather general and often erroneous term.[17] It is often and indiscriminately applied to accounts which are held as tenants in common, as tenants by entirety, as joint tenants with right of survivorship, and to accounts which simply carry authority to check. We think this evidence, standing alone, is insufficient to overcome the strong evidence of ownership standing in and by the certificate of title. The statement that "I guess as being his wife I had an interest in it" amounts to no more than an assertion of that belief of which all wives seem to be capable. We have heard that it is not uncommon for the wife to have an "interest," often acute, in her husband's bank account and everything else he owns.

■ However, inferring or assuming this was an account held in the name of both husband and wife, the actual interest held both by establishment of and withdrawal from the account is a question of *intention*.[18] And, assuming that this was a joint tenancy, or tenancy by entirety, it is still a question of intention to be determined from the facts in each individual case

15. Section 301.210 RSMo 1949, V.A.M.S.; Robertson v. Central Manufacturer's Mut. Ins. Co., 239 Mo.App. 1169, 207 S.W.2d 59.

16. See Murphy v. Wolfe, 329 Mo. 545, 45 S.W.2d 1079.

17. See Rodney v. Landeau, 104 Mo. 251, 15 S.W. 962, 964.

18. 48 C.J.S. Joint Tenancy § 3d, p. 917; Weber v. Jones, 240 Mo.App. 914, 222 S.W.2d 957; Schnur v. Dunker, Mo.App., 38 S.W.2d 282, 284; see Clevidence v.

whether there is authority in one individual to make withdrawals and whether the tenancy will follow the proceeds purchased by the withdrawals from the account. We think the previous conduct of the parties and the circumstances of the withdrawal would determine whether there was any presumption to that effect as applied to each case. In Ambruster v. Ambruster, 326 Mo. 51, 31 S.W.2d 28, loc. cit. 37, 77 A.L.R. 782, where the wife withdrew funds to purchase corporate stock, it was said:

> "Taking a common sense view of the matter, if a husband and wife have a joint bank account, either or the survivor to draw, and therefrom he buys a suit of clothes or *an automobile,* or she a dress or some jewelry, it would seem forced and unnatural to say the purchaser becomes a trustee for the other spouse as to a joint interest in the property. * * * The very fact that each is given the separate right to draw on the account would seem equivalent to a sort of standing permission to appropriate parts of the fund from time to time, especially considering the provision in the statute giving either party the right to terminate the drawing privilege by giving notice to the bank. [Italics ours.]

> " * * * That rule is, as we have stated, that the joint form of the account, either or the survivor to draw, of itself alone raises a presumption of fact, or inference, that the joint interest of the depositors follows funds withdrawn by either and negatives the idea that such withdrawals were severed from the joint estate and appropriated by the drawer to his own use. But the presumption is a weak one and readily yields to parol proof of the real intention of the parties.

And while it makes a prima facie case for the party asserting the joint interest, the burden of proof is on him to establish his title by a preponderance of all the evidence." [19]

And the *acquiescence* to the purchase of property with joint funds by one in his sole name prevents the joint interest, if any existed, from following the property so purchased.[20]

It would seem that the practical, and therefore better, rule to follow in regard to withdrawals from entirety accounts would be this: Where the withdrawals are partial and not obviously to obtain unfair ownership or advantage, and where the purpose of the withdrawal can reasonably be considered as one which could suit the wishes, purposes, and intention or consent of both the owners of the entirety account, and there is no apparent objection after the withdrawal is known, then the *presumption* should be that the withdrawal was by consent and agreement of the joint owners.

To sustain the defendant's contention we would have to assume and hold (a) that this was indeed a joint or entirety account, (b) that the husband wrongfully and *contrary to the intention of the parties* purchased the car with the joint funds, (c) that the plaintiff did not thereafter acquiesce in such purchase. None of these things are proved, but if they had been, still defendant has not carried her point, for such action on the part of the plaintiff would only have given to the wife some right of action to follow the proceeds for the purpose of establishing something at least analogous to a resulting trust in the property. The doctrine of such a resulting trust is that it probably expresses the *intention of the parties.*[21] What we mean to

Mercantile Home Bank & Trust Co., 355 Mo. 904, 199 S.W.2d 1.

19. See also Feltz v. Pavlik, Mo.App., 257 S.W.2d 214, loc. cit. 218.

20. Zahner v. Voelker, Mo.App., 11 S.W. 2d 63; see State Bank of Poplar Bluff v. Coleman, 241 Mo.App. 600, 240 S.W. 2d 188, 190, 191.

21. Haguewood v. Britain, 273 Mo. 82, 199 S.W. 950.

say is this: The wife and the administratrix are two different parties and often represent divergent and conflicting interests. The right to follow the proceeds, if such right existed, was an affirmative, aggressive right which belonged to the wife, not to the administratrix, a right which the wife, not the administratrix, could elect to exercise or not to exercise. Nor was it a right which inured to the defendant. Since it is obvious that the wife had not chosen to take such action, we think the defendant cannot now pick it up and stuff it down the administratrix's unwilling throat in order to gag her action. These remarks are, of course, intended to apply only to a situation where there is no fraud involved in attempting to shift or conceal the real ownership in order to make a better case. There is no evidence of such fraud here.

■ The evidence is that plaintiff was returning from a trip in the country to see her mother and was on her way to the hospital for the purpose of talking with a doctor about a friend's baby. The trip was not on any business or purpose of her husband. Such being the case, the wife stood in position of bailee, and her negligence was not imputable to her husband.[22]

Plaintiff's Instruction 3, dealing with the administratrix's claim for property damage, is as follows:

"The Court instructs the jury with respect to Count II of plaintiff's petition, the count for damages to the Hudson automobile driven by plaintiff, that if you find and believe from the evidence that at the time and place mentioned in evidence the Hudson automobile driven by Louise Harrellson was owned by Glenn Harrellson, and if you further find and believe from the evidence that the plaintiff, Louise Harrellson, drove and operated said Hudson automobile into the inter-

section of said Mulberry Street with Castor Street, and that in so doing she entered the said intersection prior to the time the defendant Barbara Hopkins Barks reached said intersection, if you so find, and if you further find and believe from the evidence that after the said Louise Harrellson had so entered said intersection, and was in the process of crossing said intersection, if you so find, the defendant Barbara Barks carelessly and negligently drove her said Mercury automobile into said intersection, and collided with said Hudson automobile then and there operated by the said Louise Harrellson, and that such negligence, if any, directly caused or directly contributed to cause said collision, and that as a direct result of said collision, said Hudson automobile was damaged, if you so find then your verdict will be in favor of the plaintiff Louise Harrellson, Administratrix, and against the defendant Barbara Barks on Count II of plaintiff's petition."

The defendant attacks this instruction from all sides. Rather than further lengthen this opinion by pulling the arrows out one by one, we will attempt to set forth our reasons why we believe it was not erroneous, as applied to the facts peculiar to this case.

■ The plaintiff pleaded specific negligence in failure to yield the right of way when the Hudson had entered the intersection and the Mercury was approaching. It will be noted that the instruction is limited to defendant's entry upon the intersection at a time *after* the plaintiff's car had entered and was crossing. In that respect it is different from instructions which involve a plaintiff's vehicle approaching the intersection and the hypothesization of facts attending a situation which may involve combined acts of

22. Foster v. Campbell, 355 Mo. 349, 196 S.W.2d 147; Dooley v. Dooley, Mo.App., 290 S.W.2d 856; Niedner v. Wabash R. Co., Mo.App., 219 S.W.2d 886; Stoeckle v. St. Louis & H. R. Co., 214 Mo.App., 124, 258 S.W. 58, 60.

negligence. The duty to so yield is an absolute duty imposed by statute.[23] The duty *not* to enter the intersection is a negative one as opposed to a positive duty to take some action as is required in the stop and swerve and control cases. If the defendant entered the intersection when it was already occupied by the plaintiff's vehicle and a collision resulted, such facts alone established a basis of recovery.[24] There was no necessity of hypothesizing the fact that defendant had reason to believe a collision would occur at a time plaintiff was already on the intersection. The statute, in forbidding entry upon a pre-empted intersection, contemplates that a collision may occur if the second car enters. Hence the negligent act is simply in doing what the statute says must not be done. The instruction did not broaden the petition by submitting general negligence. It submitted the specific act of negligence charged.

 We think it was not necessary that the instruction consider and hypothesize the proposition that the cars got to the intersection at approximately the same time. It clearly sets forth the state of facts whereby the plaintiff got onto the intersection *and was crossing it* before defendant entered. Under such a state of facts the defendant violated a duty if she entered, even though she may have been unable to avoid doing so because of antecedent negligence in approaching at too high a speed.[25] Nor do we know of any way to define the word "approximately" as applied to this case, without making the instruction confusing. If the defendant thought the instruction needed clarification and had the courage to attempt it, it was her duty to offer further instructions to accomplish that purpose.[26] The instruction

used in this case is quite similar to that approved in Sommer v. St. Louis Public Service Co., Mo.App., 262 S.W.2d 355, and not dissimilar to those in Cooksey v. Ace Cab Co., Mo., 289 S.W.2d 40, and Jameson v. Fox, Mo.App., 269 S.W.2d 140, and Orloff v. Fondaw, Mo.App., 315 S.W.2d 430.

 We recognize the rule that the first man to the intersection does not have an absolute right.[27] But that is of no benefit to the defendant here, because, under the rather exceptional facts of this case, any lack of care on the part of the driver of plaintiff's car cannot be considered. If the negligence of defendant directly contributed to cause the collision, then she is liable irrespective of the fact that the driver of plaintiff's car may also have been negligent in entering where she did not have such "absolute" right of way.

And we think there was evidence to support the instruction: The plaintiff said that when she was not much in excess of 22 feet north of the intersection the defendant was opposite the third house down the street. While we do not have the distance to the third house, that to a point opposite the first house was some 68 feet and the jury could have inferred from all the circumstances the plaintiff was out on the intersection while defendant was yet approaching. And the witness Brown put plaintiff near the center of the intersection about the time defendant was about to enter upon it.

Plaintiff-respondent's Instruction 6, with reference to the defendant's counterclaim, also a primary negligence claim, was as follows:

"The Court instructs the jury with respect to the counterclaim of the de-

23. Section 304.021(1), V.A.M.S., Laws of 1953, p. 587; Cooksey v. Ace Cab Co., Mo., 289 S.W.2d 40.

24. Orloff v. Fondaw, Mo.App., 315 S.W. 2d 430; see Jameson v. Fox, Mo.App., 269 S.W.2d 140, 145.

25. Horrell v. St. Louis Public Service Co., Mo., 277 S.W.2d 612, 615; Cooksey v. Ace Cab Co., Mo., 289 S.W.2d 40.

26. Witt v. Peterson, Mo., 310 S.W.2d 857; Thurman v. St. Louis Public Service Co., Mo., 308 S.W.2d 680; Barnes v. Vandergrift, 364 Mo. 829, 269 S.W.2d 13.

27. See Wilson v. Toliver, 365 Mo. 640, 285 S.W.2d 575; James v. Berry, Mo.App., 301 S.W.2d 530; Montgomery v. Petrus, Mo.App., 307 S.W.2d 24.

fendant Barbara Barks, that the said Barbara Barks was under the law, bound to exercise the highest degree of care in the operation of said automobile at the time and place in question, that is, such care as a very careful and prudent person would exercise under the same or similar circumstances. In this connection you are further instructed that if you find and believe from all the evidence that, under all the circumstances shown in evidence that before the said Barbara Barks drove said automobile into the intersection mentioned in evidence, *the plaintiff had already entered said intersection,* if you so find, and if you further find and believe that before the said Barbara Barks entered said intersection she carelessly and negligently failed to keep a lookout for other vehicles entering said intersection from the north, and if you further find and believe that such negligence, if any, on the part of the said Barbara Barks directly caused or directly contributed to cause the collision mentioned in evidence, then the defendant Barbara Barks is not entitled to recover on her counterclaim and your verdict on said counterclaim will be in favor of the plaintiff Louise Harrellson and against the defendant Barbara Barks."

It is contended that this is a general submission, and that there was no evidence to justify it.

▇▇▇ The instruction is based upon the naked failure to look. It is at least capable of the interpretation that the violation of the duty to look and see (as being a part of the cause of the collision) arose *after* the plaintiff entered the intersection,

and this is the way we understand it. If our interpretation is correct, then the instruction is bad, because there is no evidence to justify the conclusion that any failure to look at a time *after* plaintiff entered upon the intersection had anything to do with the collision. There must be evidence to support the submission.[28] We do not wish to repeat and reassemble the evidence, but the substance of it is (a) at the time the plaintiff entered upon the intersection the defendant *had* looked and seen the plaintiff and was in fact sliding her wheels and (b) it was entirely speculative whether at that time any failure to look or sight could have had any effect to cause or contribute to cause the collision, because the die was already cast.

▇▇▇ We recognize that, stated as a generality, the duty to look is a continuous one.[29] But even if we interpret the instruction as submitting a failure to look at *any* and all times prior to the collision (and thus *including* any point or place "back yonder" and before the plaintiff entered upon the intersection), it nevertheless included and called attention to a space and time (that *after* plaintiff "had already entered" the intersection), which we say was when there was no substantial evidence of failure to look and when any failure to look could have no causal connection.[30] Failure to look as this period might have been the basis of the jury's finding. At all events, we believe the instruction is misleading, and for these reasons the defendant is entitled to a new trial on her counterclaim.

Since there can be only one judgment, the entry on plaintiff's verdict on her Count II (the administratrix's action for property

---

28. Biehle v. Frazier, 360 Mo. 1068, 232 S.W.2d 465; Rhees v. Koehler, Mo. App., 241 S.W.2d 812, 814; Hook v. St. Louis Public Service Co., Mo.App., 317 S.W.2d 644, 650; Bunch v. Mueller, 365 Mo. 494, 284 S.W.2d 440, 444.

29. Anthony v. Morrow, Mo.App., 306 S.W.2d 581; Douglas v. Whitledge, Mo. App., 302 S.W.2d 294.

30. We would be inclined to question the sufficiency of hypothesization of facts *prior* to the time plaintiff's car entered upon the intersection (see Burke v. Renick, Mo.App., 249 S.W.2d 513, and cases cited at loc. cit. 517) were it not for the rule announced in Nelson v. Evans, 338 Mo. 991, 93 S.W.2d 691.

damage) must be put into storage as an interlocutory judgment, so that all of the issues may be eventually disposed of in one final judgment. The case is reversed and remanded for retrial on Counts I and III of plaintiff's petition and on the defendant's counterclaim.

STONE, P. J., and McDOWELL, J., concur.