WILLIAM EDWARD TURBETT, Respondent, v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant, No. 42768—252 S. W. (2d) 319.

Division One, November 10, 1952.

*Thomas J. Cole* and *Oliver L. Salter* for appellant.

578

*Frank X. Mattes* and *Chelsea O. Inman* for respondent.

HYDE, P. J.—Action for damages for personal injuries sustained when plaintiff was struck by defendant's engine. Verdict and judgment for plaintiff for $18,000.00, and defendant has appealed.

The case was submitted on humanitarian negligence of failure to warn, stop or slacken speed. The question for decision is whether plaintiff made a case for the jury. We, therefore, consider the evidence [320] most favorably to plaintiff's contentions.

Plaintiff was struck on the Sand Plant crossing, at the west end of defendant's Jefferson City yards, which crosses five of defendant's tracks. The general direction of defendant's tracks was east and west. The crossing was about 16 feet wide and the road went north and east to the Sand Plant on the bank of the Missouri River. There was a pump house on the river bank about 55 feet north of defendant's north track. There was also a boat dock nearby. Plaintiff went there about 2:00 A. M. on the night of December 28, 1949 to look for a motor that had been stolen from him. He did not find the motor and as he started back, defendant's freight train had started west from a point in the yards about 1000 feet east of the crossing. The train was on the north track, which was straight for 300 feet east of the crossing and

which had a grade of 0.64% ascending to the west. Plaintiff related what happened as follows: "I walked to within twelve feet of the track, the north rail, and I looked and glanced to my left, and I seen the train approaching. * * * Then I looked to the west and started walking. * * * I thought the train was on the second track * * * I got within six or eight inches of the south rail of the north track. I was looking at a signal that attracted my attention up the track, * * * to my right. When I got near the south rail I turned around to my left again and seen the train was on top of me. * * * It wasn't over six or seven feet. * * * I jumped. * * * And something brushed my left leg and spun me around and tripped me, and I fell on my buttocks and back on my back. The train ran over my leg."

Plaintiff not only saw the headlight but heard the engine chugging loud enough to prevent him from hearing the engine bell and he knew the train was moving. He stopped (coming to a complete standstill) twelve feet from the north rail of the north track and looked east toward the train. He then started forward slowly, walking about two miles per hour, taking steps about two and one-half feet long (plaintiff was about six feet tall), looking west at a red signal light about 900 feet away, walking about a foot west of the center of the road. Plaintiff said he saw no headlight to the west and that there was no other engine at or near the crossing except the one he saw and heard coming from the east. He was not trying to beat the engine; he was not in a hurry and had the whole night to spend. He intended to go back to look for the motor again before morning. The chugging of the engine continued right up to the time he was struck and got louder as the engine approached the crossing. The headlight was bright and would blind him if he looked at it very long, but he could see the outline of the engine. The engineer saw plaintiff standing near the track when the front end of the engine was 50 or 55 feet from him. (He said plaintiff was then three or four feet from the track and that plaintiff waved to him.) The parties agree that the speed of the train was from five to seven miles per hour.

Plaintiff had two expert witnesses on stopping distances, James T. Walker and Frederick Biery, retired locomotive engineers. Both testified 25 to 30 feet would be the stopping distance at six miles per hour (defendant's evidence was 80 feet) for a train of the length and weight of the one involved on the grade shown. (2 engines, 5 empties, 39 loads, 2 cabooses, total weight 2510 tons.) Walker said the engineer's reaction time would be 6/10 of a second. Biery said it would take approximately two seconds from the time the valve was put into emergency until the brakes were fully applied. During that time he said the train would travel about 18 feet. Walker said at six miles per hour the speed would be reduced

two-thirds after running 20 feet after the brakes were applied. The overhang of the engine was 34 inches and Biery said a man four feet from the rail would be in the clear of a slow moving train.

Plaintiff's theory is that his danger zone of imminent peril commenced when he started toward the track from the point where he stood still 12 feet from the north rail. He walked, at 2 miles per hour, between 16 and 17 feet. (12 feet to [321] the rail; the distance between the rails was 4 feet 8½ inches and plaintiff had not cleared the south rail.) The train going three times as fast as plaintiff was, therefore, about 50 feet from plaintiff's path over the crossing when he started toward the track. However, we think plaintiff's theory is incorrect in assuming that the engineer's duty commenced at that time. Only obliviousness of the approach of the train could extend the danger zone that far and the engineer was only required to act on reasonable appearances of obliviousness. (Womack v. Missouri Pacific R. Co., 337 Mo. 1160, 88 S. W. (2d) 368; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Allen v. Kessler, Mo. Sup., 64 S. W. (2d) 630.) Thus the danger zone would commence at the point where reasonable appearances of obliviousness began.

Plaintiff claims obliviousness because he thought the train was on the second track but the engineer could not know what he thought and failure to anticipate that he would think so would not be humanitarian negligence. The reasonable appearances of the situation were that plaintiff knew the train was approaching when he looked directly at it. There could hardly be a more evident warning of its approach than its bright headlight and in addition to that there was the chugging noise of the engine which plaintiff said was louder than the engine bell. A whistle would not have given plaintiff any more information than he had as to which track the train was on, and plaintiff so admitted in his testimony, but in any event there was no humanitarian duty to warn when the reasonable appearances were that plaintiff was aware of the approach of the train. (Pentecost v. St. Louis, M.B.T.R. Co., 334 Mo. 572, 66 S. W. (2d) 533; Dister v. Ludwig, 362 Mo. 162, 240 S. W. (2d) 694.) The engineer was not bound to anticipate that plaintiff (walking slowly) would go on the track when the bright headlight of the engine was shining directly on him. It was said in oral argument (on rehearing) that a whistle after plaintiff got on the track would have caused him to accelerate his pace so that he could have escaped. We think it is wholly a matter of speculation and conjecture, under these circumstances, whether a whistle would have prevented the casualty. (See Vietmeier v. Voss, Mo. Sup., 246 S. W. (2d) 785.) Plaintiff's cited cases Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S. W. (2d) 1000,

l.c. 1002-3; Larey v. Missouri-Kansas-Texas R. Co., 333 Mo. 949, 64 S. W. (2d) 681, l.c. 684; Diel v. St. Louis Public Service Co., 238 Mo. App. 1046, 192 S. W. (2d) 608 are not in point on this situation.

On the issue of obliviousness plaintiff says a distinction must be drawn between "obliviousness of an approach of an instrumentality" and "obliviousness of impending danger" from it, stressing Marczuk v. St. Louis Public Service Co., (196 S. W. (2d) l.c. 1003.) However, it is not the mental state of the plaintiff that imposes a duty upon the operator of a vehicle. It is the reasonable appearances of the situation that imposes the duty to act. In the Marczuk case, plaintiff approached the streetcar track in the daytime and he came from behind another streetcar. The case was ruled on oblivious imminent peril arising "when it became or reasonably should have become apparent to the motorman that it was Marczuk's fixed intention to enter upon and cross the southbound tracks." (Of course, a plaintiff may destroy a case of apparent obliviousness by testifying that he was not actually oblivious. See Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47.) The question of when the duty to warn commences must be decided upon the issue of reasonable appearances of such obliviousness. It cannot be decided upon subjective considerations as to what the plaintiff thought but must instead be decided upon objective indications of his situation. In cases, where the plaintiff looked toward a vehicle standing still, or moving slowly, and it later started or accelerated its speed, when plaintiff was looking away from it, the reasonable appearances of the situation as to his obliviousness are very different from a case of the vehicle continuing at the same speed from the time plaintiff saw it. (See Larey v. Missouri-Kansas-Texas R. Co., 333 Mo. 949, 64 S. W. (2d) 681.) In this case we do not think it is reasonable to say that there were reasonable appearances [322] of the plaintiff's obliviousness of impending danger from the train, when its bright headlight was shining on him in the nighttime as he slowly moved closer to the track, after looking directly at the engine. He could not then reasonably be considered unaware of the approach of the engine with its headlight shining so brightly all around him. We, therefore, hold that plaintiff failed to make a jury case on failure to warn.

Certainly no duty to stop arose when plaintiff, after looking directly at the engine, took his first step toward the track. Even after he had taken three steps, he would still have been in the clear, 4½ feet from the track. Of course, it would become apparent at some time after plaintiff started toward the track and before he reached the rail (looking to the west) that he intended to go on the track. However, with the reasonable appearances of the situation being

that plaintiff must have known of the approaching train, his zone of imminent peril, which would require action by the engineer, was very narrow. Under such circumstances, the duty of the operator of a vehicle ''does not commence until such person is actually in its path or so close to it that it is apparent (at the rate of speed and manner he is moving) that he will not stop before reaching it.'' (Smithers v. Barker, supra, 111 S. W. (2d) l.c. 53, and cases cited.) The reason is, as said therein: ''This is because a person, who is not oblivious and has the ability to stop, is not in a position of any peril whatever (certainly not imminent peril) when he is merely moving toward the path of a moving vehicle, and he does not come into a position of imminent peril therefrom until he is directly in the path of such vehicle or so close thereto that he cannot stop short of its path.''

Assuming it could reasonably be found that the appearances of the situation were sufficient to show that plaintiff intended to go on the track while he was taking his third step and was approximately halfway between the point, where he stood still looking at the engine and the north rail, nevertheless we do not think there was substantial evidence of ability to prevent the casualty by stopping the train. At that point, plaintiff would have been not more than 11 feet from the point of impact (the point plaintiff reached when the engine struck him) and the train would have been about 33 feet from it. In a reaction time of $6/10$ $(3/5)$ of a second, the train would move more than five feet, and the stopping distance of 25 to 30 feet after the brakes were applied does not leave sufficient stopping space, especially considering plaintiff's expert testimony to the effect that it required approximately two seconds from the time the valve was put in emergency until the brakes were fully applied. While, as suggested, the brakes on some cars would be on sooner, it is evident that even this would require some time. Under the evidence, the case must be ruled on a speed of six miles per hour. (Knight v. Richey, No. 42790, 363 Mo. 293, 250 S. W. (2d) 972, decided July 14, 1952, Division One. Our conclusion is that plaintiff did not make a jury case on failure to stop. (See Gosney v. May Lumber & Coal Co., 352 Mo. 693, 179 S. W. (2d) 51; Flint v. Chicago, B. & Q. R. Co.; 357 Mo. 215, 207 S. W. (2d) 474; Hunt v. Chicago, M. & St. P.R. Co., 359 Mo. 1089, 225 S. W. (2d) 738; Wilkerson v. St. Louis Public Service Co., Mo. Sup., 243 S. W. (2d) 953.)

It remains to be determined if there was an issue for the jury as to whether the engineer could have prevented the casualty by slackening speed. We granted a rehearing to determine whether this was an ''almost escaping'' case like Stith v. St. Louis Public Service Co., No. 42697, 363 Mo. 442, 251 S. W. (2d) 693, decided September 8, 1952, Division One. Plaintiff said he first saw the engine when he was within six or eight inches of the south rail and ''it wasn't

over six or seven feet'' from him. It would have required about 2/3 of a second for the engine to travel six feet. Plaintiff said he jumped; but he described the situation, as follows: ''Q. Your best judgment is you were six 'or eight inches from the south rail when you started to jump? A. Yes. Q. Have you any idea as to whether you were caught before you got over the rail? A. Something brushed my leg as I jumped. I don't know what it was. Q. What I was really getting at is: Were both feet off the ground in the jump, or did you still [323] have them on the ground? A. I couldn't say that, but I was in the act of jumping.'' The hospital record introduced by plaintiff shows plaintiff stated that ''he went to see about an outboard motor on the river and returning he tripped and fell.'' The overhang of the engine was 34 inches, so plaintiff had to jump a little more than 3½ feet to get in the clear. He said he tensed and jumped in a fraction of a second after he saw the engine but it only required a fraction of a second (not more than 2/3 of a second) for the engine to reach him. Plaintiff's evidence was that the speed of six miles per hour could have been reduced two-thirds after the brakes had been applied for 20 feet. As we have pointed out, the engine was about 33 feet from plaintiff when he was taking his third step toward the track. Considering reaction time and time required for the brakes to take effect, we do not think there was substantial evidence to show that enough additional time could have been added by any possible slackening of speed to have allowed plaintiff to escape. This is true because plaintiff's testimony and the nature of his injuries show that he had not completely cleared the south rail when he was struck. Thus the situation, considered most favorably to plaintiff, depends upon such fractions of a second as to leave the matter to speculation and conjecture. We, therefore, hold that plaintiff did not make an ''almost escaping'' case on slackening speed.

The judgment is reversed. All concur.