Michael SHEPARD, by Delores Shepard,
his mother and next friend, and James
Shepard, Plaintiffs-Respondents,

v.

Arch McGOUGAN, Jr.,
Defendant-Appellant.

No. 37957.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Dec. 20, 1977.

Motion for Rehearing and/or Transfer
Denied Feb. 14, 1978.

Application to Transfer Denied
April 10, 1978.

Fitzsimmons & Fitzsimmons Attorneys, Inc., George L. Fitzsimmons, Daniel J. McMichael, Clayton, for defendant-appellant.

Gray & Ritter, Robert F. Ritter, St. Louis, for plaintiffs-respondents.

NORWIN D. HOUSER, Special Judge.

Michael Shepard, 15 years of age at time of injury, brought this action, by his next friend, against Arch McGougan, Jr. for damages for personal injuries sustained by him when the right front tire of defendant's automobile ran over Michael's foot. Michael's father James joined as a party plaintiff, suing for loss of his son's services and reimbursement for outlays made for medical, surgical and hospital expenses. A jury awarded Michael $45,000 and allowed James $2,500. Defendant has appealed.

The first question is whether plaintiffs made a submissible case of humanitarian negligence based on failure to stop and failure to sound a warning.

Maxine Johnston was driving a pickup truck west on Vineland Road in DeSoto, carrying her daughter Wanda and Michael Shepard as passengers. It was dusk, dark enough for the lights on the pickup to be turned on. Maxine was on her way home, intending to drop Michael off at his grandmother's house, which was located on the south side of Vineland Road. Vineland at that point is "wide enough for two cars to go up and down." Maxine stopped the pickup on the pavement on the right (or north) side of the road, there being no shoulder. Maxine stopped the pickup 5 feet east of grandmother's mailbox located on the north side of the road. Maxine turned on the flashers when she came to a stop. On the way, as Maxine passed intersecting Second Street, defendant McGougan's automobile had entered Vineland, turned and followed Maxine's pickup. Defendant's lights were turned on. When the pickup stopped, defendant in turn stopped his car 10 to 20 feet behind the pickup. Michael did not leave the pickup immediately, tarrying long enough to tell Wanda, his girl friend, goodbye and give her a kiss. Maxine testified she told Michael to be sure and watch behind the truck because there was a car behind them, and to make sure it was going to stay there. Wanda testified that as Michael started to get out of the pickup her mother warned Michael to watch out, because there was a car behind them. Michael said nothing to acknowledge that he heard Maxine's warning, and at trial did not remember whether Maxine gave him the warning. Nor did he remember whether he looked back and saw defendant's automobile or its lights—he did not know it was "back there." Michael got out on the right-hand side and walked around in front of the pickup, 2 or 3 feet from the front of the pickup. His height was 5 feet 3 or 4 inches. He could see across the hood to his grandmother's house. He did not remember whether he stopped in front of the pickup, or whether he looked to his right or left to see if any cars were coming. He did not remember seeing defendant's car at any time before it was on his foot. Michael did not run; he was walking at a normal pace. All he remembered was that he put his hand on the pickup, "and as soon as [he] started to step out then [his] foot got ran over." The front bumper did not hit him; the right front wheel ran over his left foot. He said when the accident happened his foot was 3½ or 4 feet out (south) of the driver's side of the pickup. There was nothing to prevent Michael from looking to the left to see if cars were coming, once he cleared the pickup truck. He said he could have stopped immediately if a warning had been given, but that no horn was honked. Maxine verified that Michael was walking,

not running, "just a normal walk." She said when Michael walked around in front of the pickup and got to the left headlight he paused in front of it, with his left hand on the hood, and looked first to the right and then to the left. Confronted with her deposition in which she had testified he looked first to his left and then to his right, Maxine said she could not remember which. All she knew was that he turned his head "to check the road both ways." After Michael looked he "took a step to cross the road." At the most Michael took one or two steps out into the street past the pickup when the accident happened. As Michael started to step out she could see the headlights from the car behind her "weave out enough to come around," and then the car "hit him." She heard no horn sounded. (Defendant admitted he did not sound his horn.) Michael was walking, standing up at all times before he was struck, "looking straight ahead when this happened." He appeared to be "walking straight." Defendant's car stopped, resting on Michael's foot. It had to be moved to release him. Maxine estimated 2 or 3 seconds elapsed from the time Michael first looked to the left until the "collision"; that it was 8 or 10 feet from the front headlight of the pickup to the driver's door.

Wanda verified her mother's testimony that Michael looked to the left, then to the right, then stepped out and the car "hit him"; that after looking both ways he took off, and it happened "just one, two, three." She testified he could not have taken more than two steps; that the defendant's car came around while Michael was looking to the right; that from the time he looked until time of impact a matter of 2 or 3 seconds elapsed. Wanda was aware of defendant's car following them up Vineland because she saw the reflection of defendant's headlights in the mirrors of the pickup.

According to defendant McGougan he stopped his automobile, not knowing whether "they" were going to get mail out of the mailbox, or had motor trouble. He did not see Michael get out of the pickup on the right side. He was stopped about 30 seconds, with his headlights on. He saw no activity whatever. He then turned on his left directional signals, looked behind him, "eased out slow because it was kind of on a hill," and seeing no traffic from the rear or oncoming he "eased out about even with the [pickup] truck * * * not knowing whether somebody was working in front of the truck or what could be happening." One of his concerns was that "somebody might be crossing the street in front of the truck." As he pulled around the pickup, and as the hood of defendant's car was even with the driver's door of the pickup, he could see over the hood of the pickup to the area in front of the pickup. Defendant looked to his right and took a quick glance toward the hood of the pickup, thinking perhaps "they" had engine trouble and someone was working on the truck, or maybe getting mail out of the mailbox. The hood of the pickup was down. He did not see anything else. In his deposition defendant testified that as he was passing the pickup the right side of defendant's car was three and a half or four feet from the left side of the pickup. At trial he put it at 2 to 3 feet. At that time he saw no pedestrian, "not a soul," although it is inescapable that at that time Michael was in front of the pickup, standing in the light from its headlights. As defendant was moving forward, looking straight ahead, he heard a thud, and "stopped in one split second, immediately." He had not seen Michael. If he had seen him he thought he could have stopped in time to have kept from hitting him. In his deposition he said he couldn't have been going over 3 or 4 m. p. h. At trial he testified he was proceeding 2 or 3 m. p. h., looking straight in front of his car. He got out, heard the boy say, "You're on my foot. Would you please back off my foot." He immediately got in his car, put it in reverse and backed up 3 feet off the boy's foot. He told Michael at the scene he didn't see him and asked where he came from. He testified Michael said, "I saw you but it was too late. I tried to stop but my foot slipped out from under me, I slid under the wheel."

As indicated, plaintiffs' case was submitted to the jury on failure to stop and failure to sound a warning, under the humanitarian doctrine. Considering the evidence in the light most favorable to the prevailing party, plaintiffs made a submissible case of humanitarian failure to stop. A determination of this issue involves precise computations of place, time, distance and speeds of two moving bodies: the pedestrian plaintiff and defendant's automobile. The factor of defendant's speed is based upon his own testimony that he "couldn't have been going over three or four miles an hour." Traveling at 3–4 m. p. h. defendant's vehicle was moving at a rate of from 4½ to 6 feet per second. Traveling at that speed defendant stopped "in one split second, immediately." Defendant testified that at 3 m. p. h. he could stop "in a matter of inches"; at 4 m. p. h. it would be "close to a foot." The trial court took judicial notice, and instructed the jury without objection, that an automobile travelling at a speed of 3–4 m. p. h. "may be stopped almost instantly." In the absence of evidence of reaction time we take judicial notice that ¾ of a second is required. At 3 m. p. h. an automobile travels 3.375 feet in ¾ of a second. At 4 m. p. h. an automobile travels 4.5 feet in ¾ of a second. On the basis of these calculations the jury could find that, traveling at 3 m. p. h., defendant could have stopped in 4.375 feet, including reaction time, after the occasion to stop arose; that, traveling at 4 m. p. h. defendant could have stopped in 5.5 feet, including reaction time, after the occasion to stop arose. Michael was not running just before his injury; he was "walking at a normal pace." The court took judicial notice, and instructed the jury without objection, that ordinary walking speed is 2 or 3 m. p. h. At that speed Michael would travel 2.9 to 4.4 feet per second. *Bunch v. Mueller*, 365 Mo. 494, 284 S.W.2d 440, 443 (banc 1955); *DeLay v. Ward*, 364 Mo. 431, 262 S.W.2d 628, 635[9] (banc 1953); *Edwards v. Dixon*, 298 S.W.2d 466, 469[3] (Mo. App.1957). Defendant's duty to take evasive action arose when Michael came into a position of immediate danger. The jury could find that Michael reached a position of immediate danger when defendant saw, or by the exercise of the highest degree of care could have seen, Michael moving toward the path of his automobile apparently intending to continue into its path and apparently oblivious of its approach. *Edwards v. Dixon*, supra, 298 S.W.2d l.c. 469; *Wofford v. St. Louis Public Service Co.*, 252 S.W.2d 529, 533[6] (Mo.1952); *Wright v. Osborn*, 356 Mo. 382, 201 S.W.2d 935, 938 (1947); *Williams v. Ricklemann*, 292 S.W.2d 276, 281[8] (Mo.1956); *Triller v. Hellwege*, 374 S.W.2d 104, 107[4] (Mo.1963); *Murphy v. Land*, 420 S.W.2d 505, 509[10] (Mo.1967). Michael was not in a position of immediate danger until he started forward, after having stopped at the left front headlight of the pickup. The jury could find that at the moment he started forward he was in immediate danger requiring defendant to stop or sound a warning to prevent injury to him. The distance from the point where Michael had been standing at the left front headlight, to the place where his foot engaged the right front tire of defendant's automobile, considering the evidence in the light most favorable to Michael, was from 5 to 6 feet. At the speed Michael was walking (2–3 m. p. h. at most) he would have taken from 1.36 to 1.79 seconds to negotiate this short distance. On the basis of these facts the jury could find that at the time Michael started forward from his standing position defendant's automobile, traveling at 3–4 m. p. h., was from 6.12 to 10.74 feet distant from point of impact. Defendant did not stop within the approximately 6 to 10 feet available to him, although he could have stopped within from 4.375 to 5.5 feet, including reaction time.

These computations assume that at the moment Michael started forward from his standing position he instantly attained maximum traveling speed of 2.9 to 4.4 feet per second, but the jury could find that he was not at fully attained speed during the first second. Upon such a finding the time it took him to reach point of impact would have been more than 1.36 to 1.79 seconds, which in turn would place defendant's auto-

mobile farther back, giving defendant more time and distance within which to stop. Accepting Wanda's testimony that from the time Michael looked until impact 2 or 3 seconds elapsed the mathematics are even more favorable to Michael. In that event, subtracting ¾ of a second for reaction time, the time lapse from Michael's resumption of his walk until impact was as much as 2¼ seconds, which would place defendant's car, in round numbers, from 10 to 13 feet distant from point of impact.

For some reason defendant simply failed to see Michael, who was there in front of the pickup, under this evidence, where he could be seen as he reached and paused at the left front headlight, illuminated by the headlights of both pickup and defendant's car. For some reason defendant failed to observe Michael start forward into his path, looking straight ahead, apparently (and *actually* under Michael's testimony) oblivious of danger, in time to avoid injury by stopping. Defendant admitted that if he had seen Michael he could have stopped in time to avoid hitting him. One possible reason why defendant did not see Michael is that defendant was looking straight ahead, preoccupied with the possibility that a car might be approaching from the west, coming over the crest of the hill ahead, which was only 60 or 70 feet west of the pickup. (Defendant admitted that if oncoming [eastbound] traffic had come onto the scene there would have been a head-on collision.)

The same considerations apply to the second assignment of humanitarian negligence: failure to sound a warning. If when Michael started forward, apparently oblivious of defendant's approach and intent on crossing the street, defendant, 6 to 13 feet short of point of impact, had blown his horn, there is evidence that Michael could and would have instantly checked his course and avoided injury. Defendant admits that until the automobile tire and Michael's foot met Michael was "entirely capable of stopping" and that Michael "could have stopped in mid-stride a split second before impact." Defendant had sufficient reaction time within which to blow his horn, but failed to do so. Plaintiff made a case of humanitarian failure to sound a warning.

Defendant argues that plaintiffs' theory is, and the evidence shows, that Michael took a normal step and put his foot on the pavement immediately in front of and under the right front tire of defendant's automobile; that since Michael could have stopped instantly he was not in a position of immediate danger until the last step, or last half step; that it was only after Michael "passed this infinitesimally close point of no return that defendant could be found guilty of humanitarian negligence"; that even if defendant could have seen this action of Michael defendant would neither have had time to stop or sound a warning in time to have done any good. This argument is based upon the thesis that Michael was not oblivious, and upon a misunderstanding of the time when the jury could have found that Michael first entered a position of immediate danger. As indicated, the jury could have found that Michael entered that position at the instant he resumed his forward progress, after stopping at the left front headlight of the pickup. Although the time frame is short, and the distance minimal, between the place where he entered that position and the place where his foot was run over, the essentials of a humanitarian case were present, and the court did not err in submitting the case to the jury.

■ Defendant argues that Michael was not oblivious and the jury could not have so found; that before Michael left the Johnston vehicle he was warned to watch for the car behind them; that both Maxine Johnston and his girl friend were aware of the approach of defendant's car (and therefore Michael should have been); that both testified that Michael looked both ways before proceeding forward; that Michael did not deny looking both ways and did not deny he had independent knowledge of the presence and danger of defendant's car (testifying only that he disremembered). As to the alleged warning: neither Maxine nor Wanda would testify that Michael responded or reacted to the warning by uttering an ac-

knowledgment that he heard and understood, and the jury may have concluded that Michael was not conscious of the warning; that his mind was on something else, and not on his own personal safety. On the issue whether Michael looked before resuming his walk, the jury was at liberty to disbelieve and reject the testimony of Maxine Johnston and her daughter that Michael looked both ways, when considered in connection with Michael's uncertain testimony on the issue, and the surrounding circumstances in the case. *Hinds v. Kircher*, 379 S.W.2d 607 (Mo.1964); *Capriglione v. Southwestern Bell Tel. Co.*, 376 S.W.2d 205 (Mo.1964); *Young v. K. C. Southern Ry. Co.*, 374 S.W.2d 150 (Mo.1964). Evidently the jury rejected the testimony that Michael looked both ways. Furthermore, the testimony of Maxine and Wanda on this issue related to Michael's actions after he had stopped, while he was standing in front of the Johnston vehicle and *before* he resumed forward motion (during which time Michael was not in any danger). Michael could not be found in a position of imminent danger *until he moved forward.* "It is the reasonable appearances of the situation that imposes the duty to act." *Turbett v. Thompson*, 363 Mo. 577, 252 S.W.2d 319, 321 (1952). As Michael moved forward after stopping, looking straight ahead, apparently intent on crossing the street, the jury could find that it reasonably appeared that Michael was oblivious *at that time*, thereby giving rise to the duty on defendant's part to stop or awaken Michael from his apparent lethargy by issuing a warning. In other words, the jury could have found obliviousness, from the reasonable appearances of the situation, at the time Michael came into a position of immediate danger.

■ Defendant's second point is that the verdict of $45,000 for Michael and $2,500 for his father, a total of $47,500, is so grossly excessive as to indicate bias and prejudice on the part of the jury. The mere size of the verdict does not in and of itself establish that it was the result of bias or passion and prejudice, without showing some other error committed at the trial. *Skadal v. Brown*, 351 S.W.2d 684, 690 (Mo.

1961); *Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, 116[17] (Mo.1973). No such error and no untoward incident occurring during the trial likely to have biased the jury or aroused the passion and prejudice of the jury appears from a reading of the transcript, and defendant points to no such error or incident. Defendant is not entitled to relief under Point II.

■ Defendant's third point is that a substantial remittitur should be ordered because even if there was no other error the verdict is excessive. Michael sustained a fractured fibula and a fractured tibia. These were crushing type fractures. There was separation and dislocation of the fractured fragments. There was marked swelling of the ankle; deep lacerations of the foot and ankle, one of which was 1 by 3 inches, the other 2 by 4 inches in size; ulceration or excavation-type laceration at the big toe and deep lesions of the medial malleolar area, which areas were studded with foreign bodies that could not be completely removed. An open reduction of the fracture was not possible due to extensive swelling. A cast was applied with a window in the area of the lacerations. Twenty-four days after the accident the cast was removed. There was an incomplete healing of the fracture. A short leg cast was applied. Michael spent six days in the hospital immediately after the accident. Readmitted to the hospital approximately six weeks after the accident, he underwent surgery for open reduction of the fractured ankle, since there was nonunion of the fracture site. (Ulcerations around the ankle were then healing.) An open reduction of the malleolus was done, with insertion of a metal screw and a new cast was applied. The screw was inserted by drilling a hole in the fractured fragment and affixing it to the broken bone, the screw driven into the bone with a screwdriver. Twenty-one days later this cast was removed, and a walking cast applied. About two weeks later it was discovered by X-ray examination that the screw had broken. Forty-one days later Michael was readmitted to the hospital for removal of the broken screw, which was

684

done under general anaesthetic. A portion of the screw was removed. The other broken part of the screw was allowed to remain. When last examined by the operating surgeon Michael was informed that nothing further could be done. At that time and at trial time the ankle would get stiff. Michael was afraid to jump on it. It did not feel sturdy when he would run. At the end of the day when he is on it a lot it swells, and when it swells it pains and throbs. He used an ankle brace which kept the swelling down but the pain was still there. He cannot move the ankle in several ways the doctor told him to move it. It gives him trouble when he goes to sleep. He had been involved in sports activities, football, basketball and track, and had played on the teams before the accident, but afterward he has been unable to do any of that, and has not gone out for the teams. At trial time there were scars on the ankle. The ankle bone is enlarged and sticks out at the fracture site. " * * * [W]hen you're going swimming it's kind of ugly. I can't wear certain kinds of boots or it will rub on that." A Dr. Walters, who examined Michael some 27 months after the accident, reported complaints of pain, soreness, stiffness and swelling of his left foot and ankle; residual scars on the left ankle, and occasional throbbing sensation in the left ankle region; weakness and giving way of the ankle. Examination revealed a 2½-inch surgical scar across the middle portion of the ankle joint; a 1½-inch scar across the area bisecting the first scar; a 1 by 3 inch scarred area typical of a third degree burn or deep abrasion over the medial aspect of the left foot in the arch region; a ½ by ½ inch scar over the base of the left great toe, which scars were tender to pressure. The left leg was ½ inch smaller in circumference than the right, due to atrophy. Motions of the ankle were restricted, doriflexion showing only 5 degrees (about a 16% loss); plantarflexion, which means bending the foot down, like turning the toes toward the floor, ranged to 20 degrees as compared to thirty degrees on the right foot; inversion (turning the foot in) was limited to 5 degrees on the left as compared with 15 degrees on the right; eversion (turning the foot out) was impossible with the left foot whereas eversion of the right foot was accomplished to 15 degrees. He was able to stand on the toes of both feet but in doing this he complained of a sensation of tightness and stiffness in the left foot and ankle. There was numbness—a slight diminution of sensation—over the scarred area, outer aspect of left ankle. X rays showed a healed fracture in fair position of the medial malleolus of the left tibia with a bony and fibrous union. There was scarring of the fractured site. The metal screw measured 1½ inches inside the fibula. The fibrous scar tissue across the ankle joint restricted the movement of the ankle, causing permanent stiffening of the ankle and inability to move it in various directions as described. The pain, soreness, stiffness, swelling, throbbing and weakness of Michael's left foot and ankle will be permanent, in the doctor's opinion. Arthritis, which formed in the ankle joint as a result of the injuries, will get worse over a period of years as he walks on it. If it gets more severe he may well experience more stiffness. Participation in any type of athletic activities is curtailed as a result of his disability in the left ankle. Any type of activity in industrial pursuits, such as heavy lifting, stooping, bending that joint, climbing or straining the ankle, will cause aggravation and pain. Plaintiffs' medical evidence was undisputed. Michael was examined by a physician of defendant's choice, who did not testify. Eighteen years of age at trial time, he had a life expectancy of 52.1 years. The medical bills totalled $2,034. Michael was unable to perform any physical services for his father during his recuperation period.

The question of excessiveness of the verdict was raised and presumably considered by the trial judge, who made no order of remittitur. The jury has a broad discretion in fixing damages. Considering all of the evidence on the question of damages in the light most favorable to the verdict; comparing the injuries, special damages, percentage and permanence of residual disabil-

ities, relative ages and previous condition of health, changing economic eras and the ravages of inflation, and the compensation awarded and approved in cases of similar or fairly comparable injuries and damages [1]; and considering the rule of uniformity of awards for similar injuries, we have concluded that the award is not excessive or manifestly unjust; that it is not so great as to shock the conscience of the court, and that a remittitur is not indicated.

Judgment affirmed.

SIMEONE, C. J., and ALDEN A. STOCKARD, Special Judge, concur.

---

1. Noting, among many others, awards of $50,000 to 22-year-old in *Dykeman v. Ashton*, 8 Ariz.App. 327, 446 P.2d 26 (1968); $50,000 to 16-year-old in *Pike v. Roe*, 213 Kan. 389, 516 P.2d 972 (1973); $60,000 to 19-year-old in *Powers v. City of Troy*, 28 Mich.App. 24, 184 N.W.2d 340 (1970); $46,500 in *Miles v. Ace Van Lines & Movers, Inc.*, 72 Wis.2d 538, 241 N.W.2d 186 (1976).